**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| ONESTA IP, LLC, | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | ) |
| | )   C.A. No. 1:25-cv-587 |
| QUALCOMM INC., NOTHING | ) |
| TECHNOLOGY LIMITED, and ONEPLUS | )   **JURY TRIAL DEMANDED** |
| TECHNOLOGY (SHENZHEN) CO., LTD. | ) |
| | ) |
| | ) |
|     Defendant. | ) |

## **ONESTA IP, LLC'S COMPLAINT FOR PATENT INFRINGEMENT**

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), Plaintiff Onesta IP, LLC ("Plaintiff" or "Onesta") files this Complaint for patent infringement ("Complaint") and for jury trial against Defendants Qualcomm Inc. ("Qualcomm"), Nothing Technology Limited ("Nothing Technology") and OnePlus Technology (Shenzhen) Co., Ltd. ("OnePlus") (collectively "Defendants"). Onesta alleges as follows:

## **THE PARTIES**

1.      Onesta is a Delaware Corporation with a principal place of business located at 230 Sugartown Road, Suite 100, Wayne, PA 19087.

2.      Onesta is the owner by way of assignment of U.S. Patent No. 8,854,381 ("the '381 Patent") attached as Exhibit A, U.S. Patent No. 9,519,943 ("the '943 Patent") attached as Exhibit B, U.S. Patent No. 7,717,350 ("the '350 Patent") attached as Exhibit C,  U.S. Patent No. 11,741,019 ("the '019 Patent") attached as Exhibit D, and U.S. Patent No. 9,116,809 ("the '809 Patent") attached as Exhibit E. All of the aforementioned patents are collectively referred to herein as the "Asserted Patents."

**Qualcomm**

3.      Defendant Qualcomm is a corporation organized under the laws of the State of Delaware and has regular and established places of business within this judicial District including at least the following locations: 13929 Center Lake Drive Building 4.1, Suite 100, Austin, TX 78753 and 9600 N. Mopac, Suite 900, Stonebridge Plaza II, Austin, TX 78759. Upon information and belief, Qualcomm employs individuals in this judicial District involved in the research, development, sales, and marketing of its products and services that infringe the Asserted Patents.

4.      Upon information and belief, Qualcomm is a global technology company that designs and manufactures semiconductors and wireless telecommunications products. According to Qualcomm's website, its portfolio "includes products for processors, modems, platforms, RF systems, and connectivity, plus products based on the end-use application of your design. [Qualcomm] offer[s] a full range of purpose-built, pre-packaged software, hardware, and tools[.]" https://www.qualcomm.com/company#about (accessed 4/11/2025).

**Nothing Technology**

5.      Upon information and belief, Defendant Nothing Technology is a corporation organized and existing under the laws of the United Kingdom and maintains an established place of business located at 21A John Street, Bedford House, London, United Kingdom, WC1N 2BF.

6.      Upon information and belief, Nothing Technology's business includes the design, manufacture, and/or sale of consumer electronics including smartphones, wearables (*e.g.*, smartwatches), audio devices (*e.g.*, earbuds), and accessories thereto. *See* https://us.nothing.tech/.

7.      Nothing Technology engages in business in Texas. Pursuant to § 17.044 of the Texas Civil Practice & Remedies Code, Nothing Technology may be served with process by serving the Texas Secretary of State located at 1019 Brazos Street, Austin, Texas 78701, as its agent for service because it engages in business in Texas.

**OnePlus**

8.      Upon information and belief, Defendant OnePlus is a corporation organized and existing under the laws of China, with a principal place of business located at 18th Floor, Block C, Tairan Building, Tairan 8th Road, Shenzhen, Guangdong, 518000, China.

9.      Upon information and belief, OnePlus's business includes the design, manufacture, and/or sale of consumer electronic devices, including smartphones, tablets, wearables (*e.g.*, smartwatches), audio devices (*e.g.*, earbuds), and accessories thereto. *See* https://www.oneplus.com/us.

10.     OnePlus engages in business in Texas. Pursuant to § 17.044 of the Texas Civil Practice & Remedies Code, OnePlus has designated the Secretary of State as its agent for service of process and may be served with process through the Secretary of State.

**THE ASSERTED PATENTS**

11.     The '381 Patent is entitled "Processing Unit That Enables Asynchronous Task Dispatch," and issued on October 7, 2014, to inventors Michael Mantor and Rex McCrary. The '381 Patent issued from United States Patent Application No. 12/874,134, which was filed on September 1, 2010.

12.     The '943 Patent is entitled "Priority-Based Command Execution," and issued on December 13, 2016, to inventors Philip J. Rogers, David Gotwalt, Tom Frisinger, and Rex McCrary. The '943 Patent issued from United States Patent Application No. 13/171,979, which was filed on June 29, 2011.

13.     The '350 Patent is entitled "Portable Computing Platform Having Multiple Operating Modes and Heterogeneous Processors," and issued on May 18, 2010, to inventors Robert Ober, William T. Edwards, and R. Stephen Polzin. The '350 Patent issued from United States Application No. 11/478,740, which was filed on June 30, 2006.

14.     The '019 Patent is entitled "Memory Pools in a Memory Model for a Unified Computing System," and issued on August 29, 2023, to inventors Anthony Asaro, Kevin Normoyle, and Mark Hummel. The '019 Patent issued from United States Patent Application No. 17/471,552, which was filed on September 10, 2021.

15.     The '809 Patent is entitled "Memory Heaps in a Memory Model for a Unified Computing System," and issued on August 25, 2015, to inventors Anthony Asaro, Kevin Normoyle, and Mark Hummel. The '809 Patent issued from United States Patent Application No. 13/724,879, which was filed on December 21, 2012.

16.     The Asserted Patents are each valid and enforceable.

17.     Onesta owns all right, title, and interest in the Asserted Patents.

## JURISDICTION AND VENUE

18.     This is an action for patent infringement under the patent laws of the United States, Title 35 of the United States Code. Accordingly, this Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

## Qualcomm

19.     Venue in this judicial District is proper under 28 U.S.C. §§ 1391(b), (c), and 1400 because Qualcomm has regular and established places of business within this District and has committed acts of infringement in this District.

20.     Qualcomm has maintained regular and established places of business in this judicial District, including at least such offices and/or facilities at: 13929 Center Lake Drive Building 4.1, Suite 100, Austin, TX 78753 and 9600 N. Mopac, Suite 900, Stonebridge Plaza II, Austin, TX 78759.

21.     Upon information and belief, Qualcomm has thousands of employees based in the

Western District of Texas and does business in this judicial District and across the State of Texas.[1] Qualcomm's employees in this judicial District include, for example, CPU security architects, CPU power and performance analysis engineers, physical design engineers, SoC performance architects, FEA engineers, CPU verification engineers, and power integrity engineers.[2] Upon information and belief, these personnel have expertise in the infringing Qualcomm products, including testing, validation, and qualification activities relating to such integrated circuits, including to satisfy customer specific requirements. Accordingly, upon information and belief, witnesses and documents relevant to this action are located in this judicial District.

22.    This Court has personal jurisdiction over Qualcomm. Qualcomm is subject to this Court's specific personal jurisdiction pursuant to due process and/or the Texas Long Arm Statute, at least in part, because Qualcomm conducts business in this judicial District. *See* Tex. Civ. Prac. & Rem. Code §§ 17.041-.045. Moreover, Onesta's causes of action arise, at least in part, from Qualcomm's contacts with and activities in the State of Texas and this judicial District. *Id.*

23.    Qualcomm has done business in and has committed acts of infringement in this District by offering (directly and through intermediaries), by inducing third parties to offer, and by contributing to the offering of its products or services, including those accused of infringement here, to customers and potential customers located in this District.

24.    Qualcomm has committed acts within this judicial District giving rise to this action and has established sufficient minimum contacts with the State of Texas such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice. Furthermore,

---

[1] https://www.qualcomm.com/company/facilities/offices?country=USA&page=3 (accessed 4/11/2025).

[2] *See*, *e.g.,*
https://careers.qualcomm.com/careers/*/austin_tx?query=%2A&location=austin%20tx&pid=446702355183&domain=qualcomm.com&sort_by=relevance (accessed 4/11/2025).

personal jurisdiction over Qualcomm in this action comports with due process. For example, in addition to Qualcomm regularly conducting business within this District, it has purposefully availed itself to the privileges of conducting business in this District and has sought protection and benefit from the laws of the State of Texas. Having purposefully availed itself of the privilege of conducting business within this District, Qualcomm should reasonably anticipate being brought into court here.

25.    Qualcomm has also repeatedly acknowledged this Court has personal jurisdiction over it. *See, e.g.*, *Network Systems Techs. LLC v. Qualcomm Inc.*, C.A. No. 1:22-cv-1331, Dkt. No. 41 (W.D. Tex. Feb. 27, 2023) (not contesting this Court's personal jurisdiction over Qualcomm and that venue is proper in this District); *Future Link Sys., LLC v. Qualcomm Inc.*, C.A. No. 00265, Dkt. No. 17 (W.D. Tex. May 28, 2021) (admitting to having offices in this District).

26.    On information and belief, Qualcomm has placed or contributed to placing infringing products, including the products accused herein, into the stream of commerce knowing or understanding that such products would be sold and used across the United States, including in this judicial District. For example, apart from other Qualcomm activities within this judicial District described above, Qualcomm sells its infringing products including, but not limited to, the accused Qualcomm Snapdragon 8 Gen 3 processor (which is incorporated into, at least, the OnePlus 13R smartphones) within this judicial District including, at least, the following Best Buy locations: 4970 US-290, Austin, TX 78735, 9607 Research Blvd Ste 500, Austin, TX 78759, and 1201 Barbara Jordan Blvd Ste 100, Austin, TX 78723, and the accused Qualcomm Snapdragon 8+ Gen 1 processor (which is incorporated into, at least, the Nothing Phone (2) smartphones) at least at Walmart locations, including: 710 Ben White Blvd., Austin, TX, 78704, 13201 Ranch Road 602 N., Austin, TX, 78717, and 2525 W Anderson Ln, Austin, TX 78757.

**Nothing Technology**

27.     Venue in this district is proper under 28 U.S.C. § 1391(c)(3) with respect to Nothing Technology. Nothing Technology is not a resident of the United States and may be sued in this District because suits against foreign entities are proper in any judicial District where they are subject to personal jurisdiction. Nothing Technology has committed acts of infringement in this District.

28.     This Court has personal jurisdiction over Nothing Technology. Nothing Technology is subject to this Court's specific personal jurisdiction pursuant to due process and/or the Texas Long Arm Statute, at least in part, because Nothing Technology conducts business in this judicial District. *See* Tex. Civ. Prac. & Rem. Code §§ 17.041-.045. Moreover, Onesta's causes of action arise, at least in part, from Nothing Technology's contacts with and activities in the State of Texas. *Id*.

29.     Nothing Technology has conducted and does conduct business within the State of Texas. For example, the Nothing Phone (2) smartphone is offered for sale at Walmart.com available for delivery in the State of Texas.



https://www.walmart.com/ip/Nothing-Phone-2-A065-256GB-12GB-RAM-5G-DUAL-SIM-Global-Model-GSM-FACTORY-UNLOCKED-White/2226786516 (accessed 04/17/2025) (showing Nothing Phone (2) available for shipment to Austin, TX 78732 by Apr. 26, 2025).

Additionally, Nothing Technology offers the Nothing Phone (2) smartphone for sale on its storefront on Amazon.com available for delivery in the State of Texas.



https://www.amazon.com/Nothing-Phone-Interface-Display-Resistant/dp/B0C9LP4WPZ/ref=asc_df_B0C9LP4WPZ?mcid=8ff3b8f534173b65be338ade60872063&tag=hyprod-20&linkCode=df0&hvadid=693712892374&hvpos=&hvnetw=g&hvrand=1503109333675116763&hvpone=&hvptwo=&hvqmt=&hvdev=c&hvdvcmdl=&hvlocint=&hvlocphy=9001990&hvtargid=pla-2186127658020&th=1 (showing Nothing Phone (2) available for shipment to Marshall, TX 75670 by Thurs. Apr. 17, 2025) (accessed 04/14/2025).

Nothing Technology's Amazon storefront includes at least 55 reviews of the Nothing Phone (2) from the United States. *See* https://www.amazon.com/Nothing-Phone-Interface-Display-Resistant/dp/B0C9LP4WPZ/ref=asc_df_B0C9LP4WPZ?mcid=8ff3b8f534173b65be338ade60872063&tag=hyprod-

20&linkCode=df0&hvadid=693712892374&hvpos=&hvnetw=g&hvrand=15031093336751167
63&hvpone=&hvptwo=&hvqmt=&hvdev=c&hvdvcmdl=&hvlocint=&hvlocphy=9001990&hvta
rgid=pla-2186127658020&th=1#averageCustomerReviewsAnchor (accessed 04/14/2025,

showing 55 reviews in the United States).

Also, for example, Nothing Technology offers its products in Texas and purposefully directs its

activities at Texas residents. For example, Nothing Technology phones have been purchased by

consumers in Texas.



https://www.facebook.com/marketplace/item/508786031737420/ (accessed 04/17/2025, showing

consumer in possession of Nothing Phone (2) in this District and offered for sale in this District in

Austin,                    TX);                    see                    also                    e.g.,

https://www.reddit.com/r/NothingTech/comments/14rt81e/does_anyone_elses_phone_overheat/

(accessed   04/14/2025)   (showing   end-user   of   Nothing   phone   living   in   Dallas,   TX);

https://www.reddit.com/r/NothingTech/comments/1bj4e5x/incredible_unboxing_ama/   (accessed

04/14/2025) (showing end-user describing Nothing phone 2A shipping with "1.5 Day shipping"

from Hong Kong to San Antonio, TX).

30.     Nothing Technology, directly or through corporate relatives, subsidiaries, or intermediaries (including distributors, retailers, and others), ships, distributes, makes, has made, uses, tests, sells, offers for sale, imports, markets, and/or advertises (including by providing interactive web pages), its infringing products in the United States and the Western District of Texas, including without limitation smartphones.

31.     Nothing Technology, directly and/or through subsidiaries or intermediaries (including distributors, retailers, and others), have purposefully and voluntarily placed one or more of the products that infringe, as described below, into the stream of commerce with the expectation that those products will be purchased and used by customers and/or consumers in the Western District of Texas. These infringing products and/or services have been and continue to be made, used, sold, offered for sale, purchased, and/or imported by customers and/or consumers in the Western District of Texas. [3] These infringing products, including the Nothing Phone (2) smartphones, are available for delivery throughout this District, including but not limited to from Walmart and Amazon.com.

32.     Upon information and belief, Nothing Technology makes, has made, uses, tests, sells, offers for sale, and/or imports throughout the United States, including within this judicial District, the Nothing Phone (2) smartphones, incorporating the Qualcomm Snapdragon 8+ Gen 1 processor. https://us.nothing.tech/pages/phone-2 (accessed 04/11/2025).

33.     Nothing Technology is thus subject to personal jurisdiction in the State of Texas. *See, e.g.*, *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-98 (1980) (holding that under the stream of commerce theory, a corporation subjects itself to personal jurisdiction in a

---

[3] *See, e.g.*, https://us.nothing.tech/pages/phone-2 (accessed 04/11/2025).

forum when it "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum"); *Largan Precision Co. v. Ability Opto-Elecs. Tech. Co.*, No. 4:19-cv-696, 2020 U.S. Dist. LEXIS 18697, at *19-20 (E.D. Tex. Feb. 5, 2020) (finding personal jurisdiction over Taiwanese manufacturer of optical lenses, AOET, who "place its products in the stream of commerce that begins in Asia and ends in the United States and in Texas, it intends and desires for its products to be sold in the United States. . . . finished products incorporating AOET's lenses frequently are made available for sale in multiple retail locations in Texas. Moreover, AOET appears to have, . . . the *intent* that its products be sold in the United States and Texas, . . . And as far as its sales in Texas, while AOET may not have direct and complete control over where the final products containing its lenses end up being sold, the Court has no problem concluding that AOET could have expected that those products would be sold in Texas.").

34.     Accordingly, Nothing Technology has established sufficient minimum contracts with the State of Texas such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

## OnePlus

35.     Venue in this district is proper under 28 U.S.C. § 1391(c)(3) with respect to OnePlus. OnePlus is not a resident in the United States and may be sued in this District, because suits against foreign entities are proper in any judicial District where they are subject to personal jurisdiction. OnePlus has committed acts of infringement in this District.

36.     This Court has personal jurisdiction over OnePlus. OnePlus is subject to this Court's specific personal jurisdiction pursuant to due process and/or the Texas Long Arm Statute, at least in part, because OnePlus conducts business in this judicial District. *See* Tex. Civ. Prac. & Rem. Code §§ 17.041-.045. Moreover, Onesta's causes of action arise, at least in part, from OnePlus's contacts with and activities in the State of Texas and in this District. *Id*.

37.     OnePlus has conducted and does conduct business within the State of Texas. OnePlus, directly or through corporate relatives, subsidiaries, or intermediaries (including distributors, retailers, and others), ships, distributes, makes, has made, uses, tests, sells, offers for sale, imports, and/or advertises (including by providing interactive web pages) its infringing products in the United States and the Western District of Texas, including without limitation smartphones, smartwatches, and tablets.

38.     OnePlus, directly and/or through subsidiaries or intermediaries (including distributors, retailers, and others), has purposefully and voluntarily placed one or more of its products that infringe, as described below, into the stream of commerce with the expectation that those products will be purchased and used by customers and/or consumers in the Western District of Texas. These products that infringe have been and continue to be made, used, sold, offered for sale, purchased, and/or imported by customers and/or consumers in the Western District of Texas. These infringing products, including the OnePlus 13R smartphones, are available throughout this district.[4] In particular, OnePlus 13R smartphones are available for pickup at least at Best Buy locations throughout this District, including but not limited to: 4970 US-290, Austin, TX 78735, 9607 Research Blvd Ste 500, Austin, TX 78759, and 1201 Barbara Jordan Blvd Ste 100, Austin, TX 78723.

---

[4] *See, e.g.*, OnePlus Store, available at https://www.oneplus.com/us/store (accessed 04/11/2025).



https://www.bestbuy.com/site/oneplus-13r-256gb-unlocked-nebula-noir/6609358.p?skuId=6609358 (accessed 04/17/2025).

39.     For example, upon information and belief, OnePlus makes, has made, uses, sells, offers for sale, and/or imports throughout the United States, including within this judicial District, the OnePlus 13R smartphones, incorporating the Qualcomm Snapdragon 8 Gen 3 processor. *See* OnePlus Store, available at https://www.oneplus.com/us/store (accessed 04/11/2025).

40.     OnePlus is thus subject to personal jurisdiction in the State of Texas. *See*, *e.g.*, *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-98 (1980) (holding that under the stream of commerce theory, a corporation subjects itself to personal jurisdiction in a forum when it "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum"); *Largan Precision Co. v. Ability Opto-Elecs. Tech. Co.*, No. 4:19-cv-696, 2020 U.S. Dist. LEXIS 18697, at *19-20 (E.D. Tex. Feb. 5, 2020) (finding personal jurisdiction over Taiwanese manufacturer of optical lenses, AOET, who "place its products in the stream of commerce that begins in Asia and ends in the United States and in Texas, it intends and desires for its products to be sold in the United States. . . . finished products

incorporating AOET's lenses frequently are made available in for sale in multiple retail locations in Texas. Moreover, AOET appears to have, . . . the *intent* that its products be sold in the United States and Texas, . . . And as far as its sales in Texas, while AEOT may not have direct and complete control over where the final products containing its lenses end up being sold, the Court has no problem concluding that AOET could have expected that those products would be sold in Texas.").

41.     Accordingly, OnePlus has established sufficient minimum contacts with the State of Texas such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

## **JOINDER**

42.     Joinder of Defendants is proper under 35 U.S.C. § 299. The allegations of patent infringement contained herein arise out of the same series of transactions or occurrences relating to the Defendants' making (or having made), using (or inducing the use of), testing, selling, offering for sale within the United States, or importing (or having imported) into the United States infringing products, including Nothing Technology's and OnePlus's, which incorporate the same or similar infringing integrated circuits made, sold, offered for sale, and/or imported by Qualcomm.

43.     Examples of such products include, for example without limitation the Qualcomm Snapdragon 8 Gen 3 processor (which is incorporated into, at least, the OnePlus 13R smartphones) and the Qualcomm Snapdragon 8+ Gen 1 processor (which is incorporated into, at least, the Nothing Phone (2) smartphones). Therefore, Defendants' products, upon information and belief, consist of or incorporate integrated circuits designed, made, used, tested, sold, offered for sale, and/or imported by Qualcomm and incorporated into Nothing Technology's and/or OnePlus's products designed, made, used, tested, sold, offered for sale, and/or imported throughout the United States and in this judicial District.

## ALLEGATIONS OF PATENT INFRINGEMENT

44.    Onesta incorporates the allegations of all the foregoing paragraphs as if fully restated herein.

45.    As set forth below, the infringing products consist of and/or incorporate, without any license from Onesta, products protected by patents owned by Onesta, including, without limitation, integrated circuits, circuit board assemblies, and electronic devices that incorporate such integrated circuits and circuit board assemblies, including, without limitation, smartphones, tablets, and smartwatches. Onesta respectfully seeks relief from this Court for Defendants' infringement.

46.    Onesta reserves the right to accuse any forthcoming technology or products of Defendants not yet commercially available, and any products about which it learns additional relevant information.

47.    Onesta is the sole and exclusive owner of all right, title, and interest in and to the Asserted Patents, and holds the exclusive right to take all actions necessary to enforce its rights to the Asserted Patents, including the filing of this action. Onesta also has the right to recover all damages for past, present, and future infringement of the Asserted Patents.

### Qualcomm

48.    Qualcomm has directly infringed, and continues to directly infringe, the Asserted Patents under 35 U.S.C. §§ 271 (a) and (g) by making, having made, using, testing, selling, offering for sale, importing, having imported, designing, advertising, and/or marketing the products that infringe in this District and elsewhere in the United States, as described in further described in Counts I-V *infra*.

49.    Qualcomm has been placed on actual notice of the Asserted Patents at least as early as the filing of this Complaint, which constitutes notice of the Asserted Patents in accordance with

35 U.S.C. § 287.

50.     Qualcomm has also indirectly infringed and continues to indirectly infringe the Asserted Patents under 35 U.S.C. § 271(b) by actively inducing its subsidiaries and affiliates, original equipment manufacturers, retailers , resellers, customers, and/or other third parties to infringe the Asserted Patents by selling the products that infringe to such third parties for use in end-user products in a manner that infringes the Asserted Patents, as described in detail in Counts I-V *infra*.

51.     Additionally, Qualcomm has indirectly infringed and continues to indirectly infringe the Asserted Patents under 35 U.S.C. § 271(c) by materially contributing to infringement of the Asserted Patents by its subsidiaries and affiliates, original equipment manufacturers, retailers , resellers, customers, and/or other third parties by making, using, testing, selling, offering for sale, advertising, marketing, and/or importing the products that infringe to such third parties in a manner that infringes the Asserted Patents, as described in detail in Counts I-V *infra*.

52.     Qualcomm's acts of infringement have caused damage to Onesta. Onesta is entitled to recover from Qualcomm the damages incurred by Onesta as a result of Qualcomm's wrongful acts.

53.     Qualcomm's acts of direct and indirect infringement are willful and have caused, and will continue to cause, substantial damage and irreparable harm to Onesta, and Onesta has no adequate remedy at law. Qualcomm performed and continues to perform the acts that constitute direct and/or indirect infringement, with knowledge or willful blindness that the acts would constitute direct and/or indirect infringement of the Asserted Patents. Notwithstanding Qualcomm's knowledge of the Asserted Patents since at least as early as the filing of the present Complaint, Qualcomm has and continues to willfully infringe the Asserted Patents.

**Nothing Technology**

54.     Nothing Technology has directly infringed, and continues to directly infringe, the Asserted Patents under 35 U.S.C. §§ 271(a) and (g) by making, having made, using, selling, offering for sale, testing, designing, advertising, and/or marketing, in this District and elsewhere in the United States, and/or importing into this district and elsewhere in the United States, products that infringe as described in further in Counts I-V *infra*.

55.     Onesta reserves the right to accuse any forthcoming Nothing Technology products not yet commercially available, and any products about which it learns additional relevant information.

56.     Nothing Technology has been placed on actual notice of the Asserted Patents at least as early as the filing of this Complaint, which constitutes notice of the Asserted Patents in accordance with 35 U.S.C. § 287.

57.     Nothing Technology has also indirectly infringed and continues to indirectly infringe the Asserted Patents under 35 U.S.C. § 271(b) by actively inducing its subsidiaries and affiliates, customers (including end-users), resellers, retailers, and/or other third parties to infringe the Asserted Patents by selling products that infringe for use in a manner that infringes the Asserted Patents, as described in detail in Counts I-V, *infra*.

58.     Additionally, Nothing Technology has indirectly infringed and continues to indirectly infringe the Asserted Patents under 35 U.S.C. § 271(c) by materially contributing to infringement of the Asserted Patents by its subsidiaries and affiliates, customers (including end-users), resellers, retailers, and/or other third parties by making, using, testing, selling, offering for sale, advertising, marketing, and/or importing products that infringe to such third parties in a manner than infringes the Asserted Patents, as described in detail in Counts I-V, *infra*.

59.     Upon information and belief, Nothing Technology sells and/or offers for sale, the

Nothing Phone (2) smartphones, which incorporate the infringing Qualcomm Snapdragon 8+ Gen 1 processor, throughout the United States and in this District.

60.    Nothing Technology's acts of infringement have caused damage to Onesta. Onesta is entitled to recover from Nothing Technology the damages incurred by Onesta as a result of Nothing Technology's wrongful acts.

61.    Nothing Technology's acts of direct and indirect infringement are willful and have caused, and will continue to cause, substantial damage and irreparable harm to Onesta, and Onesta has no adequate remedy at law. Nothing Technology performed and continues to perform the acts that constitute direct and/or indirect infringement, with knowledge or willful blindness that the acts would constitute direct and/or indirect infringement of the Asserted Patents. Notwithstanding Nothing Technology's knowledge of the Asserted Patents since at least as early as the filing of the present Complaint, Nothing Technology has and continues to willfully infringe the Asserted Patents.

### OnePlus

62.    OnePlus has directly infringed, and continues to directly infringe, the Asserted Patents under 35 U.S.C. §§ 271(a) and (g) by making, having made, using, selling, offering for sale, testing, designing, advertising, and/or marketing, in this district and elsewhere in the United States, and/or importing into this district and elsewhere in the United States, products that infringe, as described in further described in Counts I-V *infra*.

63.    Onesta reserves the right to accuse any forthcoming OnePlus Products not yet commercially available, and any products about which it learns additional relevant information.

64.    OnePlus has been placed on actual notice of the Asserted Patents at least as early as the filing of this Complaint, which constitutes notice of the Asserted Patents in accordance with 35 U.S.C. § 287.

65.    OnePlus has also indirectly infringed and continues to indirectly infringe the Asserted Patents under 35 U.S.C. § 271(b) by actively inducing its subsidiaries and affiliates, customers (including end-users), resellers, retailers, and/or other third parties by selling products that infringe to such third parties for use in a manner that infringes the Asserted Patents, as described in detail in Counts I-V *infra*.

66.    Additionally, OnePlus has indirectly infringed, and continues to indirectly infringe, the Asserted Patents under 35 U.S.C. § 271(c) by materially contributing to infringement of the Asserted Patents by its subsidiaries, affiliates, retail partners, customers, and/or other third parties by making, using, testing, selling, offering for sale, advertising, marketing, and/or importing products that infringe to such third parties in a manner than infringes the Asserted Patents, as described in detail in Counts I-V *infra*.

67.    Upon information and belief, OnePlus sells and/or offers for sale, the OnePlus 13R smartphones, which incorporate the infringing Qualcomm Snapdragon 8 Gen 3 processor, throughout the United States and in this District.

68.    OnePlus's acts of infringement have caused damage to Onesta. Onesta is entitled to recover from OnePlus the damages incurred by Onesta as a result of OnePlus's wrongful acts.

69.    OnePlus's acts of direct and indirect infringement are willful and have caused, and will continue to cause, substantial damage and irreparable harm Onesta, and Onesta has no adequate remedy at law. OnePlus performed and continues to perform the acts that constitute direct and/or indirect infringement, with knowledge or willful blindness that the acts would constitute direct and/or indirect infringement of the Asserted Patents. Notwithstanding OnePlus's knowledge of the Asserted Patents since at least as early as the filing of the present Complaint, OnePlus has and continues to willfully infringe the Asserted Patents.

## COUNT I

### Infringement of the '381 Patent

70.     Onesta incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

71.     Defendants Qualcomm, Nothing Technology, and OnePlus have directly and indirectly infringed, and continued to directly and indirectly infringe, the '381 Patent by making, having made, using, selling, offering for sale, and/or importing into the United States products that infringe the '381 Patent. The products that infringe one or more claims of the '381 Patent include, without limitation, at least the products identified herein. Further discovery may reveal additional infringing products and/or models.

72.     For example, and without limitation, the infringing products infringe one or more claims of the '381 Patent, including but not limited to claim 5. The products that infringe fall within the scope of and include, either literally or under the doctrine of equivalents, all the elements of at least claim 5 of the '381 Patent.

73.     The products that infringe include all the limitations of at least claim 5 of the '381 Patent. Specifically, the '381 Patent claims, *e.g.*, an apparatus comprising: a plurality of engines associated with a first processing unit and configured to receive, from a scheduling module associated with a second processing unit, a plurality of tasks and to load a state data associated with each of the plurality of tasks; a shader core associated with the first processing unit and configured to receive the plurality of tasks from at least one of the plurality of engines and to execute a first task from the plurality while executing a second task from the plurality of tasks based on respective state data associated with each of the first and second tasks; and, wherein the first task comprises a graphics-processing task and the second task comprises a general-computing task.

74.    With respect to exemplary devices, the OnePlus 13R smartphone, made or sold by OnePlus, incorporating the Qualcomm Snapdragon 8 Gen 3 processor, directly infringes at least claim 5 of the '381 Patent.



https://www.oneplus.com/us/oneplus-13r (accessed 04/11/2025).

75.    Another exemplary device, the Nothing Phone (2) smartphone, made or sold by Nothing Technology, incorporating the Qualcomm Snapdragon 8+ Gen 1 processor, directly infringes at least claim 5 of the '381 Patent.



https://us.nothing.tech/pages/phone-2 (accessed 04/11/2025).

76.    For example, the Qualcomm Snapdragon 8 Gen 3 processor and the Qualcomm

Snapdragon 8+ Gen 1 processor (the "Exemplary Qualcomm SoCs") are Qualcomm's mobile processors and incorporate a Kryo CPU and an Adreno 700 series GPU (Adreno 750 and Adreno 730, respectively). Upon information and belief, Adreno 700 series GPUs, including the Adreno 750 and 730 GPUs, share substantially similar structure, function, and operation.



https://docs.qualcomm.com/bundle/publicresource/87-71408-1_REV_G_Snapdragon_8_gen_3_Mobile_Platform_Product_Brief.pdf (accessed 04/11/2025).



https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/Snapdragon-8-plus-Gen-1-Product-Brief.pdf (accessed 04/11/2025).



https://nanoreview.net/en/soc/qualcomm-snapdragon-8-gen-3 (accessed 04/11/2025).



https://nanoreview.net/en/soc/snapdragon-8-plus-gen-1 (accessed 04/11/2025).

77.     In addition, upon information and belief, the Defendants' exemplary products include a plurality of engines associated with a first processing unit and configured to receive, from a scheduling module associated with a second processing unit, a plurality of tasks and to load state data associated with each of the plurality of tasks. For example, the Adreno 700 series GPU includes the "Command Processor," "Render Front End," "Binning Front End," "BV" microcontroller, "BR" microcontroller, and/or "LAPC" microcontroller, which, on information and belief, are configured to receive a plurality of tasks from the Qualcomm's Kernel Graphics Support Layer (KGSL) driver run on the Kryo CPU and to load state data associated with each of a plurality of tasks.



https://chipsandcheese.com/p/the-snapdragon-x-elites-adreno-igpu (accessed 04/11/2025).



https://chipsandcheese.com/p/correction-on-qualcomm-igpus (accessed 04/11/2025).



Fig. 5. The existing KGSL architecture for mobile GPU.

https://saumaypushp.github.io/files/ShuffleDog.pdf (accessed 04/11/2025). *See also*

https://docs.qualcomm.com/bundle/publicresource/topics/80-78185-2/overview.html?product=1601111740035277 (accessed 04/11/2025);

https://docs.qualcomm.com/bundle/publicresource/topics/80-70015-19/graphics-overview.html (accessed 04/11/2025); https://i.blackhat.com/USA-20/Thursday/us-20-Gong-TiYunZong-An-Exploit-Chain-To-Remotely-Root-Modern-Android-Devices-wp.pdf (accessed 04/11/2025).

78.     Further, upon information and belief, the Defendants' exemplary products include a shader core associated with the first processing unit and is configured to receive the plurality of tasks from at least one of the plurality of engines and to execute a first task from the plurality of tasks while executing a second task from the plurality of tasks based on respective state data associated with each of the first and second tasks. For example, upon information and belief, the Adreno 700 series GPU implements a "[u]nified shader architecture" that includes a plurality of "Shader Processors," and "Micro Shader Processor Texture Processor[s]" (uSPTPs).



https://chipsandcheese.com/p/correction-on-qualcomm-igpus (accessed 04/11/2025).



https://chipsandcheese.com/p/inside-snapdragon-8-gen-1s-igpu-adreno-gets-big (accessed 04/11/2025).



https://docs.qualcomm.com/bundle/publicresource/topics/80-78185-2/overview.html?product=1601111740035277 (accessed 04/11/2025).

79.     The Shader Processors and uSPTPs are, upon information and belief, configured to receive the plurality of tasks from at least one of the plurality of engines and to execute a first task from the plurality of tasks while executing a second task from the plurality of tasks based on respective state data associated with each of the first and second tasks.

## Low Priority Asychronous Compute (LPAC)

LPAC (Low Priority Asynchronous Compute) is intended to perform less latency-sensitive compute tasks concurrently with other processing on the Graphics Pipe – in other words, somewhat longer-lived (on the scale of multiple milliseconds) compute tasks are often best issued with LPAC, and have somewhat different performance characteristics.

https://docs.qualcomm.com/bundle/publicresource/topics/80-78185-2/overview.html?product=1601111740035277 (accessed 04/11/2025).

In unified shader architecture, there is no separate hardware for the vertex and fragment shaders, as shown in the image below. This allows for greater flexibility of pixel and vertex load balances.



The Adreno shader architecture is also multithreaded. If a fragment shader execution stalls due to a texture fetch, another shader is scheduled for execution. Multiple shaders can be "ready to efficiently schedule" as long as there is room in the hardware (primarily GPRs).

*Id.*

### 3.2.5  Workgroup assignment

A typical OpenCL kernel launches multiple workgroups. Adreno GPUs assign each workgroup to an SP, and each SP processes one or more workgroups simultaneously. If there are any, the remaining workgroups are queued for SPs to execute. Multiple SPs cannot process one workgroup.

In earlier Adreno GPUs, one SP can only process one workgroup at a time, and one workgroup must complete execution before another one can start on the SP. The premium tiers of Adreno A6x and A7x have lifted the restrictions and fully supported the concurrent workgroup execution per SP.

https://docs.qualcomm.com/bundle/publicresource/80-NB295-11_REV_C_Qualcomm_Snapdragon_Mobile_Platform_Opencl_General_Programming_and_Optimization.pdf, at 18 (accessed 04/11/2025); *see also* https://chipsandcheese.com/p/inside-snapdragon-8-gen-1s-igpu-adreno-gets-big (accessed 04/11/2025); https://chipsandcheese.com/p/correction-on-qualcomm-igpus (accessed 04/11/2025).

80.    Also, upon information and belief, the first task comprises a graphics-processing task and the second task comprises a general-compute task. https://docs.qualcomm.com/bundle/publicresource/topics/80-78185-2/overview.html?product=1601111740035277 (accessed 04/11/2025); https://chipsandcheese.com/p/correction-on-qualcomm-igpus (accessed 04/11/2025); https://chipsandcheese.com/p/inside-snapdragon-8-gen-1s-igpu-adreno-gets-big (accessed 04/11/2025).

81.    Qualcomm has indirectly infringed, and continues to indirectly infringe, the '381 Patent under 35 U.S.C. § 271(b) by actively inducing the infringement of the '381 Patent by others, such as its subsidiaries and affiliates, original equipment manufacturers, customers, resellers, retailers, and other third parties. These others directly infringe the '381 Patent by, for example making, using, testing, selling, offering for sale throughout, or importing into the United States, including this judicial District, downstream products (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones) incorporating the products that infringe (for example, without limitation, the Exemplary Qualcomm SoCs). Qualcomm has induced and continues to induce such direct infringement by encouraging and facilitating others' infringing acts.   For example, Qualcomm hires permanent sales and/or marketing personnel located throughout the United States, and in this judicial District. On information and belief, these sales and/or marketing personnel are engaged in activities that are targeted to original equipment manufacturers, customers, resellers, retailers, and other parties, including original equipment manufacturers, customers, resellers, retailers, and other parties based in the United States, including instructions for making, using, testing, or selling the products that infringe.

82.    Qualcomm specifically intended or intends these others, such as its subsidiaries and

affiliates, original equipment manufacturers, customers, resellers, retailers, and other parties, to infringe the '381 Patent and knew or knows that the induced acts of these others constitute direct infringement. For example, although Qualcomm has notice of the '381 Patent, the scope of the claims, and the products covered thereby, Qualcomm nonetheless intentionally and knowingly encourages and facilitates these others to make, use, test, sell, offer for sale in, or import into, such covered products into the United States and thereby directly infringe the '381 Patent. Additionally, for example, Qualcomm designed the products that infringe (for example, without limitation, the Exemplary Qualcomm SoCs) such that they would each infringe the '381 Patent if made, used, tested, sold, offered for sale, or imported into the United States. Qualcomm provided, directly, or indirectly, the products that infringe to others, such as, but not limited to, customers, knowing and intending that those others use, test, sell, offer for sale, and/or import in and into the United States downstream products (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones) that incorporate the products that infringe (for example, without limitation, the Exemplary Qualcomm SoCs), thereby directly infringing one or more claims of the '381 Patent.

83.    Qualcomm has also indirectly infringed and continues to indirectly infringe the '381 Patent under 35 U.S.C. § 271(c) by materially contributing to infringement of the '381 Patent by its subsidiaries and affiliates, original equipment manufacturers, customers, resellers, retailers, and other third parties by selling the products that infringe. The products that infringe (for example, without limitation, the Exemplary Qualcomm SoCs) have no substantial non-infringing uses and are a material part of the invention. Moreover, the products that infringe provide vital functionality to downstream products (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones). Further, the products that infringe cannot be used without being incorporated into a downstream product. Thus, any manufacture, use, test, sale,

offer for sale, or importation in or into the United States of a product that infringes or a downstream product incorporating a product that infringes, infringes the '381 Patent.

84.     Defendants Nothing Technology and OnePlus have indirectly infringed and continue to indirectly infringe the '381 Patent under 35 U.S.C. § 271(b) by actively inducing the infringement of the '381 Patent by others, such as their subsidiaries and affiliates, customers (including end-users), resellers, retailers, and other third parties. These others directly infringe the '381 Patent by, for example making, using, testing, selling, offering for sale throughout, or importing into the United States, including this judicial District, the products that infringe (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones). Defendants Nothing Technology and OnePlus have induced or induces such direct infringement by encouraging and facilitating others' infringing acts. For example, upon information and belief, Defendants Nothing Technology and OnePlus market, advertise, sell and/or offer for sale, products that infringe throughout the United States and in this judicial District. Upon information and belief, these marketing, advertising, and/or sales activities are targeted towards customers (including end-users), including providing instructions for the use of the products that infringe, throughout the United States and in this judicial District.

85.     Defendants Nothing Technology and OnePlus specifically intended or intend these others, such as their subsidiaries and affiliates, customers (including end-users), resellers, retailers, and other third parties, to infringe the '381 Patent and knew or know that the induced acts of these others constitute direct infringement. For example, although Defendants Nothing Technology and OnePlus have notice of the '381 Patent, the scope of the claims, and the products covered thereby, Defendants Nothing Technology and OnePlus nonetheless intentionally and knowingly encourage and facilitate these others to make, use, test, sell, offer for sale in, or import into, such covered

products into the United States and thereby directly infringe the '381 Patent. Additionally, for example, Defendants Nothing Technology and OnePlus designed the products that infringe (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones) such that they would each infringe the '381 Patent if made, used, tested, sold, offered for sale, or imported in or into the United States. Defendants Nothing Technology and OnePlus provided, directly or indirectly, products that infringe to others, such as, but not limited to, their subsidiaries and affiliates, customers (including end-users), resellers, retailers, and other third parties, knowing and intending that those others use, sell, offer for sale, and/or import into the United States products that infringe (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones), thereby directly infringing one or more claims of the '381 Patent.

86.     Defendants Nothing Technology and OnePlus have also indirectly infringed and continue to indirectly infringe the '381 Patent under 35 U.S.C. § 271(c) by materially contributing to the infringement of the '381 Patent by their subsidiaries and affiliates, customers (including end-users), resellers, retailers, and/or other third parties by selling products that infringe. The products that infringe (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones) have no substantial non-infringing uses and are a material part of the invention. Thus, any manufacture, use, test, sale, offer for sale, or importation of the products that infringe, infringes the '381 Patent.

87.     As a result of Defendants Qualcomm's, Nothing Technology's, and OnePlus's infringement of the '381 Patent, Onesta is entitled to monetary damages in an amount adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants, together with interest and costs as fixed by the Court.

88.     Despite actual notice of their infringement since as early as the filing of the present

Complaint, Defendants' acts of direct and indirect infringement of the '381 are deliberate and willful, and have caused, and will continue to cause substantial damage and irreparable harm to Onesta, and Onesta has no adequate remedy at law.

## COUNT II

### Infringement of the '943 Patent

89.     Onesta incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

90.     Defendants Qualcomm, Nothing Technology, and OnePlus have directly and indirectly infringed, and continue to directly and indirectly infringe, the '943 Patent by making, having made, using, selling, offering for sale, and/or importing into the United States products that infringe the '943 Patent. The products that infringe one or more claims of the '943 Patent include, without limitation, at least the products identified herein. Further discovery may reveal additional infringing products and/or models.

91.     For example, and without limitation, the infringing products infringe one or more claims of the '943 Patent, including but not limited to claim 11. The products that infringe fall within the scope of and include, either literally or under the doctrine of equivalents, all the elements of at least claim 11 of the '943 Patent.

92.     The products that infringe include all the limitations of at least claim 11 of the '943 Patent. Specifically, the '943 Patent claims, *e.g.*, a processing device, comprising: a set of queues, each queue of the set of queues being configured to hold commands received from a central processing unit (CPU), wherein each command is sent from a virtual device in the CPU; a command processor configured to retrieve the received commands from the set of queues, wherein the set of queues includes a high priority queue that holds high priority commands, wherein the command processor is configured to retrieve a high priority command held in the high priority

queue before retrieving commands held in other queues of the set of queues, and wherein the processing device is configured to executed the received commands; and a processing core configured to execute the received command, wherein the command processor is configured to retrieve commands from the set of queues and send the retrieved commands to the processing core for execution.

93.    With respect to exemplary devices, the OnePlus 13R smartphone, made or sold by OnePlus, incorporating the Qualcomm Snapdragon 8 Gen 3 processor, directly infringes at least claim 11 of the '943 Patent.



https://www.oneplus.com/us/oneplus-13r (accessed 04/11/2025).

94.    Another exemplary device, the Nothing Phone (2) smartphone, made or sold by Nothing Technology, incorporating the Qualcomm Snapdragon 8+ Gen 1 processor, directly infringes at least claim 11 of the '943 Patent.



https://us.nothing.tech/pages/phone-2 (accessed 04/11/2025).

95.    For example, the Qualcomm Snapdragon 8 Gen 3 and the Qualcomm Snapdragon 8+ Gen 1 processors (again, the "Exemplary Qualcomm SoCs") are Qualcomm's mobile processors and incorporate a Kryo CPU and an Adreno 700 series GPU (Adreno 750 and Adreno 730, respectively). Upon information and belief, Adreno 700 series GPUs, including the Adreno 750 and 730 GPUs, share substantially similar structure, function, and operation.



https://docs.qualcomm.com/bundle/publicresource/87-71408-1_REV_G_Snapdragon_8_gen_3_Mobile_Platform_Product_Brief.pdf (accessed 04/11/2025).



https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/Snapdragon-8-plus-Gen-1-Product-Brief.pdf (accessed 04/11/2025).

| CPU | | Graphics | |
|---|---|---|---|
| Architecture | 1x 3.3 GHz – Cortex-X4<br>3x 3.15 GHz – Cortex-A720<br>2x 2.96 GHz – Cortex-A720<br>2x 2.27 GHz – Cortex-A520 | GPU name | Adreno 750 |
| | | Architecture | Adreno 700 |

https://nanoreview.net/en/soc/qualcomm-snapdragon-8-gen-3 (accessed 4/11/2025).

| CPU | | Graphics | |
|---|---|---|---|
| Architecture | 1x 3.2 GHz – Cortex-X2<br>3x 2.75 GHz – Cortex-A710<br>4x 2 GHz – Cortex-A510 | GPU name | Adreno 730 |
| | | Architecture | Adreno 700 |

https://nanoreview.net/en/soc/snapdragon-8-plus-gen-1 (accessed 04/11/2025).

96.     In addition, upon information and belief, the Defendants' exemplary products include a set of queues, each queue of the set of queues being configured to hold commands received from a central processing unit (CPU), wherein each command is sent from a virtual device in the CPU. For example, on information and belief, the Adreno 700 series GPU includes the "Command Processor," "Render Front End," "Binning Front End," "BV" microcontroller, "BR" microcontroller, and/or "LPAC" microcontroller, which, upon information and belief, include a plurality of queues configured to hold commands sent from a virtual device in the Kryo CPU.



[https://chipsandcheese.com/p/the-snapdragon-x-elites-adreno-igpu](https://chipsandcheese.com/p/the-snapdragon-x-elites-adreno-igpu) (accessed 04/11/2025).



Adreno 6xx unifies the ME and PFP into a single "SQE" microcontroller, and adds a separate LPAC microcontroller to handle low priority compute. The previous diagram was accurate enough, as it's a pretty simple change.

Adreno 7xx tries to speed up this work by introducing concurrency in the command processor. Adreno 6xx's SQE gets split into two microcontrollers, called BV and BR. BV handles the binning pass, and BR renders the tiles. Obviously tile rendering has a dependency on binning, but the binning process for subsequent render passes can happen while BR is crunching through tiles. The driver emits thread control commands that tell BV and BR when they should start processing commands, and when they should skip them because the other microcontroller will handle them.

A better diagram for the Adreno 7xx's command processor would have both BV and BR reading from the same command stream, with BV generally moving ahead of BR for concurrent binning.



https://chipsandcheese.com/p/correction-on-qualcomm-igpus (accessed 04/11/2025).



## Kernel Graphics Support Layer (KGSL)

The KGSL serves as the kernel-mode driver for the Adreno GPU. The primary function of the KGSL driver is to submit commands generated by the Adreno user-mode driver to the Adreno GPU for processing. Additionally, the KGSL driver communicates with the GMU to ensure proper state management.

https://docs.qualcomm.com/bundle/publicresource/topics/80-70015-19/graphics-overview.html

(accessed 04/11/2025).

37



**Figure 7. The KGSL Driver Architecture of Adreno GPU**

https://i.blackhat.com/USA-20/Thursday/us-20-Gong-TiYunZong-An-Exploit-Chain-To-Remotely-Root-Modern-Android-Devices-wp.pdf, at p. 14 (accessed 04/11/2025).

**Adreno Introduction**

The GPU is the workhorse of modern graphics computing, and most applications use the GPU extensively. From the application's perspective, the specific implementation of GPU hardware is normally abstracted away by libraries such as OpenGL ES and Vulkan. These libraries implement a standard API for programming common GPU accelerated operations, such as texture mapping and running shaders. At a low level however, this functionality is implemented by interacting with the GPU device driver running in kernel space.

https://googleprojectzero.blogspot.com/2020/09/attacking-qualcomm-adreno-gpu.html (accessed 04/11/2025).

97.     Further, upon information and belief, the Defendants' exemplary products include a command processor configured to retrieve the received commands from the set of queues, wherein the set of queues includes a high priority queue that holds high priority commands, wherein the command processor is configured to retrieve a high priority command held in the high

priority queue before retrieving commands held in other queues of the set of queues, and wherein the processing device is configured to executed the received commands. For example, upon information and belief, the Adreno 700 series GPU includes the "Command Processor," "Render Front End," "Binning Front End," "BV" microcontroller, "BR" microcontroller, and/or "LAPC" microcontroller, which, upon information and belief, configured to retrieve the received commands from the set of queues.



https://chipsandcheese.com/p/the-snapdragon-x-elites-adreno-igpu (accessed 04/11/2025).



https://chipsandcheese.com/p/correction-on-qualcomm-igpus (accessed 04/11/2025); *see also*

https://docs.qualcomm.com/bundle/publicresource/topics/80-78185-2/overview.html?product=1601111740035277 (accessed 04/11/2025).

98.    Upon information and belief, the set of queues includes a high priority queue that holds high priority commands and the command processor is configured to retrieve a high priority command held in the high priority queue before retrieving commands held in other queues of the set of queues.

### 3.3  Context switching between graphics and compute workload

#### 3.3.1  Context switch

If a high priority task, such as graphics user interface (UI) rendering, is required while a low priority workload is running on Adreno GPUs, the latter one could be forced to pause so that GPU switches to the high priority workload. When the high priority task is completed, the lower one is resumed. This type of workload switch is called context switch. Context switch is generally expensive, as it requires complex hardware and software operations. However, it is an important feature to enable the emerging and advanced timing critical tasks such as automobile applications.

#### 3.3.2  Limit kernel/workgroup execution time on GPU

Sometimes a compute kernel may be running for an excessive period and trigger an alert that causes the GPU to reset and leads to unpredictable consequences. Usually, the UI rendering on Android devices occurs with a fixed frequency, e.g., every 30 milliseconds. A long-running compute kernel could cause the UI to lag and be unresponsive, hurting the user experience. As a rule of thumb, the kernel execution time should be tens of milliseconds.

https://docs.qualcomm.com/bundle/publicresource/80-NB295-11_REV_C_Qualcomm_Snapdragon_Mobile_Platform_Opencl_General_Programming_and_Optimization.pdf, p. 20 (accessed 04/11/2025).

99.    Also, upon information and belief, the Adreno GPU is configured execute the received commands.

## Command Processor Changes

GPU drivers launch work on the device by writing command packets into a special ring buffer. Adreno's Command Processor (CP) parses these packets and distributes work across the shader array. Adreno 5xx's CP was split into a

https://chipsandcheese.com/p/inside-snapdragon-8-gen-1s-igpu-adreno-gets-big (accessed 04/11/2025).



https://chipsandcheese.com/p/correction-on-qualcomm-igpus (accessed 04/11/2025); *see also*

https://docs.qualcomm.com/bundle/publicresource/topics/80-78185-

2/overview.html?product=1601111740035277 (accessed 04/11/2025).

100.   In addition, upon information and belief, the Defendants' exemplary products include a processing core configured to execute the received command, wherein the command processor is configured to retrieve commands from the set of queues and send the retrieved commands to the processing core for execution. For example, on information and belief, the Adreno 700 series GPU implements a "[u]nified shader architecture" and includes a plurality of "Shader Processors" and "Micro Shader Processor Texture Processor[s]" (uSPTPs).

**Unified shader architecture**

All Adreno GPUs support the Unified Shader Model, which uses a consistent instruction set across all shader types.

In hardware terms, Adreno GPUs have computational units (e.g., Algorithmic Logic Unit, or ALUs) and fetch resources that support vertex, fragment and compute shaders – so much of the following advice applies to most or all of these shaders.

Shader processing is done within the unified shader architecture, as shown in the following image. This image shows that vertices and pixels are processed in groups of four as a vector, or a thread. When a thread stalls, the shader ALUs can be reassigned.



https://docs.qualcomm.com/bundle/publicresource/topics/80-78185-2/overview.html?product=1601111740035277 (accessed 04/11/2025).



https://chipsandcheese.com/p/correction-on-qualcomm-igpus (accessed 04/11/2025); *see also* https://chipsandcheese.com/p/inside-snapdragon-8-gen-1s-igpu-adreno-gets-big (accessed 04/11/2025).

101.    The Shader Processors and uSPTPs are, upon information and belief, configured to execute the received command, wherein the command processor is configured to retrieve commands from the set of queues and send the retrieved commands to the processing core for

execution.           https://chipsandcheese.com/p/inside-snapdragon-8-gen-1s-igpu-adreno-gets-big
(accessed  04/11/2025);  https://chipsandcheese.com/p/correction-on-qualcomm-igpus  (accessed
04/11/2025);                https://docs.qualcomm.com/bundle/publicresource/topics/80-78185-
2/overview.html?product=1601111740035277                (accessed                04/11/2025);
https://chipsandcheese.com/p/the-snapdragon-x-elites-adreno-igpu (accessed 04/11/2025).

102.    Qualcomm has indirectly infringed, and continues to indirectly infringe, the '943
Patent under 35 U.S.C. § 271(b) by actively inducing the infringement of the '943 Patent by others,
such as its subsidiaries and affiliates, original equipment manufacturers, customers, resellers,
retailers, and other parties. These others directly infringe the '943 Patent by, for example, making,
using, testing, selling, offering for sale throughout, or importing into the United States, including
this judicial District, downstream products (for example, without limitation, the exemplary
OnePlus 13R and Nothing Phone (2) smartphones) incorporating the products that infringe (for
example, without limitation, the Exemplary Qualcomm SoCs). Qualcomm has induced and
continues to induce such direct infringement by encouraging and facilitating others' infringing acts.
For example, Qualcomm hires permanent sales and/or marketing personnel located throughout the
United States, and in this judicial District. On information and belief, these sales and/or marketing
personnel are engaged in activities that are targeted to original equipment manufacturers,
customers, resellers, retailers, and other parties, including original equipment manufacturers,
customers, resellers, retailers, and other parties based in the United States, including instructions
for making, using, testing, or selling the products that infringe.

103.    Qualcomm specifically intended or intends these others, such as its subsidiaries and
affiliates, original equipment manufacturers, customers, resellers, retailers, and other parties, to
infringe the '943 Patent and knew or knows that the induced acts of these others constitute direct

infringement. For example, although Qualcomm has notice of the '943 Patent, the scope of the claims, and the products covered thereby, Qualcomm nonetheless intentionally and knowingly encourages and facilitates these others to make, use, test, sell, offer for sale in, or import into, such covered products into the United States and thereby directly infringe the '943 Patent. Additionally, for example, Qualcomm designed the products that infringe (for example, without limitation, the Exemplary Qualcomm SoCs) such that they would each infringe the '943 Patent if made, used, tested, sold, offered for sale, or imported into the United States. Qualcomm provided, directly, or indirectly, the products that infringe to others, such as, but not limited to, customers, knowing and intending that those others use, test, sell, offer for sale, and/or import in and into the United States downstream products (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones) that incorporate the products that infringe (for example, without limitation, the Exemplary Qualcomm SoCs), thereby directly infringing one or more claims of the '943 Patent.

104.    Qualcomm has also indirectly infringed and continues to indirectly infringe the '943 Patent under 35 U.S.C. § 271(c) by materially contributing to infringement of the '943 Patent by its subsidiaries and affiliates, original equipment manufacturers, customers, resellers, retailers, and other third parties by selling the products that infringe. The products that infringe (for example, without limitation, the Exemplary Qualcomm SoCs) have no substantial non-infringing uses and are a material part of the invention. Moreover, the products that infringe provide vital functionality to downstream products (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones). Further, the products that infringe cannot be used without being incorporated into a downstream product. Thus, any manufacture, use, test, sale, offer for sale, or importation in or into the United States of a product that infringes or a downstream product incorporating a product that infringes, infringes the '943 Patent.

105.    Defendants Nothing Technology and OnePlus have indirectly infringed and continue to indirectly infringe the '943 Patent under 35 U.S.C. § 271(b) by actively inducing the infringement of the '943 Patent by others, such as their subsidiaries and affiliates, customers (including end-users), resellers, retailers, and other third parties. These others directly infringe the '943 Patent by, for example, making, using, testing, selling, offering for sale throughout, or importing into the United States, including this judicial District, products that infringe (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones). Nothing Technology and OnePlus have induced and continue to induce such direct infringement by encouraging and facilitating others' infringing acts. For example, upon information and belief, Defendants Nothing Technology and OnePlus market, advertise, sell and/or offer for sale, products that infringe throughout the United States and in this judicial District. Upon information and belief, these marketing, advertising, and/or sales activities are targeted towards customers (including end-users), including providing instruction for the use of products that infringe, throughout the United States and in this judicial District.

106.    Defendants Nothing Technology and OnePlus specifically intended or intends these others, such as their subsidiaries and affiliates, customers (including end-users), resellers, retailers, and other third parties to infringe the '943 Patent and knew or knows that the induced acts of these others constitute direct infringement. For example, although Defendants Nothing Technology and OnePlus have notice of the '943 Patent, the scope of the claims, and the products covered thereby, Defendants Nothing Technology and OnePlus nonetheless intentionally and knowingly encourage and facilitate these others to make, use, test, sell, offer for sale in, or import into, such covered products into the United States and thereby directly infringe the '943 Patent. Additionally, for example, Defendants Nothing Technology and OnePlus designed the products that infringe (for

example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones) such that they would each infringe the '943 Patent if made, used, tested, sold, offered for sale, or imported in and into the United States. Defendants Nothing Technology and OnePlus provided, directly or indirectly, products that infringe to others, such as, but not limited to, customers (including end-users), knowing and intending that those others use, sell, offer for sale, and/or import into the United States products that infringe (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones), thereby infringing one or more claims of the '943 Patent.

107.    Defendants Nothing Technology and OnePlus have also indirectly infringed and continue to indirectly infringe the '943 Patent under 35 U.S.C. § 271(c) by materially contributing to the infringement of the '943 Patent by their subsidiaries and affiliates, customers (including end-users), resellers, retailers, and/or other third parties by selling the products that infringe. The products that infringe (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones) have no substantial non-infringing uses and are a material part of the invention. Thus, any manufacture, use, test, sale, offer for sale, or importation of the products that infringe, infringes the '943 Patent.

108.    As a result of Defendants Qualcomm's, Nothing Technology's and OnePlus's infringement of the '943 Patent, Onesta is entitled to monetary damages in an amount adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants, together with interest and costs as fixed by the Court.

109.    Despite actual notice of their infringement since as early as the filing of the present Complaint, Defendants' acts of direct and indirect infringement of the '943 Patent are deliberate and willful, and have caused, and will continue to cause substantial damage and irreparable harm

to Onesta, and Onesta has no adequate remedy at law.

## COUNT III

## Infringement of the '350 Patent

110.    Onesta incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

111.    Defendants Qualcomm, Nothing Technology, and OnePlus have directly and indirectly infringed, and continued to directly and indirectly infringe, the '350 Patent by making, having made, using, selling, offering for sale, and/or importing into the United States products that infringe the '350 Patent. The products that infringe one or more claims of the '350 Patent include, without limitation, at least the products identified herein. Further discovery may reveal additional infringing products and/or models.

112.    For example, and without limitation, the infringing products infringe one or more claims of the '350 Patent, including but not limited to claim 17. The products that infringe fall within the scope of and include, either literally or under the doctrine of equivalents, all of the elements of at least claim 17 of the '350 Patent.

113.    The products that infringe include all the limitations of at least claim 17 of the '350 Patent. Specifically, the '350 Patent claims, *e.g.*, a portable computer system comprising: a first processor configured to execute instructions corresponding to application software during a first mode of operation; a second processor configured to execute the instructions during a second mode of operation; and an input/output (I/O) hub coupled to communicate with the first processor and the second processor and configured to distribute transactions between the first and the second processor and a plurality of I/O devices; wherein the first processor and the second processor are heterogeneous processors; and wherein operation of the first processor and the second processor in the first mode and the second mode is dependent upon which of a plurality of system preferences

have been selected.

114.    With respect to exemplary devices, the OnePlus 13R smartphone, made or sold by OnePlus, incorporating the Qualcomm Snapdragon 8 Gen 3 processor, directly infringes at least claim 17 of the '350 Patent.



https://www.oneplus.com/us/oneplus-13r (accessed 04/11/2025).

115.    Another exemplary device, the Nothing Phone (2) smartphone, made or sold by Nothing Technology, incorporating the Qualcomm Snapdragon 8+ Gen 1 processor, directly infringes at least claim 17 of the '350 Patent.



https://us.nothing.tech/pages/phone-2 (accessed 04/11/2025).

116.    For example, the Qualcomm Snapdragon 8 Gen 3 and Snapdragon 8+ Gen 1 processors (again, the "Exemplary Qualcomm SoCs") are Qualcomm's mobile processors and incorporate a substantially similar Kryo CPU with ARM-based Prime, Performance, and Efficiency CPU cores.

⊞ CPU

|   |   |
|---|---|
| Architecture | 1x 3.3 GHz – Cortex-X4 |
|   | 3x 3.15 GHz – Cortex-A720 |
|   | 2x 2.96 GHz – Cortex-A720 |
|   | 2x 2.27 GHz – Cortex-A520 |

https://nanoreview.net/en/soc/qualcomm-snapdragon-8-gen-3 (accessed 04/11/2025); *see also* https://docs.qualcomm.com/bundle/publicresource/87-71408-1_REV_G_Snapdragon_8_gen_3_Mobile_Platform_Product_Brief.pdf (accessed 04/11/2025).

⊞ CPU

|   |   |
|---|---|
| Architecture | 1x 3.2 GHz – Cortex-X2 |
|   | 3x 2.75 GHz – Cortex-A710 |
|   | 4x 2 GHz – Cortex-A510 |

https://nanoreview.net/en/soc/snapdragon-8-plus-gen-1 (accessed 04/11/2025); *see also* https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/Snapdragon-8-plus-Gen-1-Product-Brief.pdf (accessed 04/11/2025).

117.    In addition, upon information and belief, the Defendants' exemplary products include a first processor configured to execute instructions corresponding to application software during a first mode of operation and a second processor configured to execute the instructions during a second mode of operation, wherein the first processor and the second processor are heterogeneous processors. For example, the Kryo CPU includes Prime core designed based on the

ARM Cortex-X4 or X2, Performance cores designed based on the ARM Cortex-A720 or A710, and Efficiency cores designed based on the ARM Cortex-A520 or A510, all of which implement the ARMv9.2-A or ARMv9-A architecture.

*See also* https://nanoreview.net/en/soc/qualcomm-snapdragon-8-gen-3 (accessed 04/11/2025); https://nanoreview.net/en/soc/snapdragon-8-plus-gen-1 (accessed 04/11/2025); https://www.arm.com/technologies/big-little (accessed 04/11/2025).

118.    Further, upon information and belief, the Kryo CPU Prime, Performance, and/or Efficiencies cores are configured to execute instructions corresponding to application software during a first mode of operation and a second mode of operation.

**Know your Core Strengths**

Traditional frequency, voltage regulation and scaling of cores have gone a long way to improve power efficiency. But now having different types of cores at your disposal opens new possibilities for tuning power efficiency as demands change throughout the application's runtime. Knowing there are different types of cores at your disposal for mobile development is important because it gives you several choices to think about as you architect your application.

For example, you can write routines that will always execute on one type of core or another, or you can write routines that can migrate between the two types. Whether that is automatically through the operating systems task scheduler, or manually through controls provided by the SDK.

https://www.qualcomm.com/developer/blog/2018/02/impact-big-core-little-core-architecture-application-development (accessed 04/11/2025).

A key aspect is to identify up front which type(s) of core(s) your various routines will run on or require. As a general rule of thumb, a good approach is to run on little cores if possible because that can reduce both heat and power consumption. In planning for this, categorize tasks as important/unimportant, high/low priority, short lived vs long running, etc. and then decide how to best allocate them to the most appropriate processor.

For example, if you know that certain code such as rendering and artificial intelligence must execute at 60fps, such high priority routines probably need to be permanently allocated to the big cores. Conversely, background threads such as sending and listening for network information can probably be allocated to little cores.

*Id.*

# Scheduler

The scheduler decides the order in which the processes must run. The scheduler runs the processes available in the runqueue of each CPU.

The kernel baseline supports the standard Linux scheduler solution. The kernel uses Energy Aware Scheduling (EAS) to choose the right CPU for task placement based on the CPU energy consumption.

EAS overrides the CFS task wake-up balancing code. It uses the energy model (EM) of the platform and the per entity load tracking (PELT) signals to choose an energy-efficient target CPU during wake-up balance in a system with asymmetric CPU topology.

For basic scheduler documentation, see Scheduler.

## CPU topology and EAS

The Qualcomm SoC platforms have a heterogeneous CPU topology that is differentiated in terms of CPU capacity metrics used in EAS.

EAS uses the concept of 'capacity' to differentiate CPUs with different computing capabilities. The capacity of a CPU represents the amount of work that it finishes when running at its highest frequency compared to the most capable CPU of the system. Capacity values are normalized in a 1024 range (the most powerful CPU/cluster is configured at 1024).

EAS builds the capacity of a cluster based on the dhrystone million instructions per second (DMIPS) value specified in the CPU node and the maximum frequency supported by the cluster.

https://docs.qualcomm.com/bundle/publicresource/topics/80-70014-3/features.html    (accessed 04/11/2025).

## Idle CPUs

Logical CPUs, simply referred to as "CPUs" in what follows, are regarded as *idle* by the Linux kernel when there are no tasks to run on them except for the special "idle" task.

Tasks are the CPU scheduler's representation of work. Each task consists of a sequence of instructions to execute, or code, data to be manipulated while running that code, and some context information that needs to be loaded into the processor every time the task's code is run by a CPU. The CPU scheduler distributes work by assigning tasks to run to the CPUs present in the system.

Tasks can be in various states. In particular, they are *runnable* if there are no specific conditions preventing their code from being run by a CPU as long as there is a CPU available for that (for example, they are not waiting for any events to occur or similar). When a task becomes runnable, the CPU scheduler assigns it to one of the available CPUs to run and if there are no more runnable tasks assigned to it, the CPU will load the given task's context and run its code (from the instruction following the last one executed so far, possibly by another CPU). [If there are multiple runnable tasks assigned to one CPU simultaneously, they will be subject to prioritization and time sharing in order to allow them to make some progress over time.]

The special "idle" task becomes runnable if there are no other runnable tasks assigned to the given CPU and the CPU is then regarded as idle. In other words, in Linux idle CPUs run the code of the "idle" task called *the idle loop*. That code may cause the processor to be put into one of its idle states, if they are supported, in order to save energy, but if the processor does not support any idle states, or there is not enough time to spend in an idle state before the next wakeup event, or there are strict latency constraints preventing any of the available idle states from being used, the CPU will simply execute more or less useless instructions in a loop until it is assigned a new task to run.

https://www.kernel.org/doc/html/v5.0/admin-guide/pm/cpuidle.html (accessed 04/11/2025); *see also* https://git.codelinaro.org/clo/la/kernel/msm-5.10/-/blob/aosp-new/caf2/caf2/clo/main/drivers/cpuidle/cpuidle.c (accessed 04/11/2025).

Idle power management, also known as CPU idle power management, keeps the CPU cores in the appropriate sleep state for efficient use of energy when the platform is idle.

**CPU Sleep states**

A CPU core supports multiple sleep states. Each sleep state has associated entry and exit latencies and different levels of power consumption. The selection of sleep state of a core depends on how quickly that core is required again for another execution.

Each CPU Sleep state is represented by a C-state number. Each C-state is associated with two key parameters:

- Power saving: The power savings of CPU increases as you select higher C-states, but this results in increased wake-up latency.
- Wake-up latency: This is the time taken to transition a CPU core from sleep state to running state.

https://docs.qualcomm.com/bundle/publicresource/topics/80-70014-30/idlepowermanagement.html (accessed 04/11/2025).

Big CPUs are generally more power hungry than the little ones and are thus used mainly when a task doesn't fit the littles. However, little CPUs aren't always necessarily more energy-efficient than big CPUs. For some systems, the high OPPs of the little CPUs can be less energy-efficient than the lowest OPPs of the bigs, for example. So, if the little CPUs happen to have enough utilization at a specific point in time, a small task waking up at that moment could be better of executing on the big side in order to save energy, even though it would fit on the little side.

And even in the case where all OPPs of the big CPUs are less energy-efficient than those of the little, using the big CPUs for a small task might still, under specific conditions, save energy. Indeed, placing a task on a little CPU can result in raising the OPP of the entire performance domain, and that will increase the cost of the tasks already running there. If the waking task is placed on a big CPU, its own execution cost might be higher than if it was running on a little, but it won't impact the other tasks of the little CPUs which will keep running at a lower OPP. So, when considering the total energy consumed by CPUs, the extra cost of running that one task on a big core can be smaller than the cost of raising the OPP on the little CPUs for all the other tasks.

https://www.kernel.org/doc/html/next/scheduler/sched-energy.html  (accessed  04/11/2025).  *See also*                            https://git.codelinaro.org/clo/la/kernel/msm-5.10/-/blob/aosp-new/caf2/caf2/clo/main/kernel/sched/fair.c (accessed 04/11/2025).

119.    Further, upon information and belief, the Defendants' exemplary products include an input/output (I/O) hub coupled to communicate with the first processor and the second processor and configured to distribute transactions between the first and the second processor and

a plurality of I/O devices. For example, the Exemplary Qualcomm SoCs include a "Connectivity" module including, *e.g.*, a "GPIO," "PCIe-0 Gen 3" interface, "USB 3.1," and other modules coupled to a Wi-Fi and Bluetooth module, an audio module, and other I/O devices.



https://www.gizmochina.com/2024/10/06/big-snapdragon-8-gen-4-leak-reveals-block-diagram-and-two-soc-variants/ (accessed 04/11/2025).

## Wi-Fi & Bluetooth®

Qualcomm® FastConnect™ 7800 System
- Wi-Fi Generation: Wi-Fi 7
- Peak Speed: 5.8 Gbps
- 802.11be, 802.11ax, 802.11ac, 802.11a/b/g/n
- Wi-Fi Spectral Bands: 6 Ghz, 5 GHz, 2.4 GHz
- Channel Bandwidth: 320/240/160/80/40/20 MHz
- 8-stream sounding (for 8x8 MU-MIMO)
- MIMO Configuration: 2x2 (2-stream)
- MU-MIMO (Uplink & Downlink)
- 4K QAM
- OFDMA (Uplink & Downlink)
- High Band Simultaneous (HBS) Multi-Link
- Wi-Fi Security: WPA3-Enterprise, WPA3- Enhanced Open, WPA3 Easy Connect, WPA3-Personal

Integrated Bluetooth
- Bluetooth Audio: Snapdragon Sound™ Technology with support for Qualcomm XPAN Technology, Qualcomm® aptX™ Voice, aptX Lossless, aptX Adaptive, and LE Audio
- Bluetooth Features: Bluetooth 5.4, LE Audio, Dual Bluetooth antennas

## Audio

| Qualcomm Aqstic™ audio codec |
| Qualcomm Aqstic smart speaker amplifier |
| Total Harmonic Distortion + Noise (THD+N) |
| Playback: -108dB |
| Qualcomm® Audio and Voice Communication Suite |
| Spatial audio with head-tracking |

https://docs.qualcomm.com/bundle/publicresource/87-71408-1_REV_G_Snapdragon_8_gen_3_Mobile_Platform_Product_Brief.pdf (accessed 04/11/2025).

## Wi-Fi & Bluetooth®

auto-exposure

Qualcomm® FastConnect™ 6900 System
- Wi-Fi Standards: Wi-Fi 6E, Wi-Fi 6 (802.11ax),
- Wi-Fi 5 (802.11ac), 802.11a/b/g/n
- Wi-Fi Spectral Bands: 2.4 GHz, 5 GHz, 6 GHz
- Peak speed: 3.6 Gbps
- Channel Bandwidth: 20/40/80/160 MHz
- 8-stream sounding (for 8x8 MU-MIMO)
- MIMO Configuration: 2x2 (2-stream)
- MU-MIMO (Uplink & Downlink)
- 4K QAM
- OFDMA (Uplink & Downlink)
- 4-Stream (2x2 + 2x2) Dual Band Simultaneous (DBS)
- Wi-Fi Security: WPA3-Enterprise, WPA3- Enhanced Open, WPA3 Easy Connect, WPA3-Personal

Integrated Bluetooth
- Bluetooth Features: Bluetooth® 5.3, LE Audio, Dual Bluetooth antennas
- Bluetooth audio: Snapdragon Sound™ Technology with support for Qualcomm® aptX™ Voice, aptX Lossless, aptX Adaptive, and LE audio

## Audio

| Qualcomm Aqstic™ audio codec (WCD9385) |
| New Qualcomm Aqstic smart speaker amplifier (WSA8835) |
| Total Harmonic Distortion + Noise (THD+N), Playback: -108dB |
| Qualcomm® Audio and Voice Communication Suite |

## Display

On-Device Display Support:
- 4K @ 60 Hz
- QHD+ @ 144 Hz

Maximum External Display Support: up to 4K @ 60 Hz
- 10-bit color depth, Rec. 2020 color gamut
- HDR10 and HDR10+

Demura and subpixel rendering for OLED Uniformity

https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/Snapdragon-8-plus-Gen-1-Product-Brief.pdf (accessed 04/11/2025).

120.    In addition, upon information and belief, operation of the first processor and the

second processor of the Qualcomm SoCs in the first mode and the second mode is dependent upon which of a plurality of system preferences have been selected. For example, operation of the Kryo CPU Prime, Performance, and/or Efficiencies cores in a first mode of operation and a second mode of operation is dependent upon which of a plurality of system preferences have been selected.

```
67    # Controls how many more tasks should be eligible to run on gold CPUs
68    # w.r.t number of gold CPUs available to trigger assist (max number of
69    # tasks eligible to run on previous cluster minus number of CPUs in
70    # the previous cluster).
71    #
72    # Setting to 1 by default which means there should be at least
73    # 5 tasks eligible to run on gold cluster (tasks running on gold cores
74    # plus misfit tasks on silver cores) to trigger assitance from gold+.
75    echo 1 > /sys/devices/system/cpu/cpu7/core_ctl/nr_prev_assist_thresh
```

```
80    # Setting b.L scheduler parameters
81    echo 95 95 > /proc/sys/walt/sched_upmigrate
82    echo 85 85 > /proc/sys/walt/sched_downmigrate
83    echo 100 > /proc/sys/walt/sched_group_upmigrate
84    echo 85 > /proc/sys/walt/sched_group_downmigrate
85    echo 1 > /proc/sys/walt/sched_walt_rotate_big_tasks
86    echo 400000000 > /proc/sys/walt/sched_coloc_downmigrate_ns
87    echo 16000000 16000000 16000000 16000000 16000000 16000000 16000000 5000000 > /proc/sys/walt/sched_coloc_busy_hyst_cpu_ns
88    echo 248 > /proc/sys/walt/sched_coloc_busy_hysteresis_enable_cpus
89    echo 10 10 10 10 10 10 10 95 > /proc/sys/walt/sched_coloc_busy_hyst_cpu_busy_pct
90    echo 8500000 8500000 8500000 8500000 8500000 8500000 8500000 2000000 > /proc/sys/walt/sched_util_busy_hyst_cpu_ns
91    echo 255 > /proc/sys/walt/sched_util_busy_hysteresis_enable_cpus
92    echo 1 1 1 1 1 1 1 15 > /proc/sys/walt/sched_util_busy_hyst_cpu_util
93    echo 40 > /proc/sys/walt/sched_cluster_util_thres_pct
94    echo 30 > /proc/sys/walt/sched_idle_enough
95    echo 10 > /proc/sys/walt/sched_ed_boost
```

```
97    #Set early upmigrate tunables
98    freq_to_migrate=1228800
99    silver_fmax=`cat /sys/devices/system/cpu/cpufreq/policy0/scaling_max_freq`
100   silver_early_upmigrate="$(((1024 * $silver_fmax / $freq_to_migrate)))"
101   silver_early_downmigrate="$(((((1024 * $silver_fmax) / (((10*$freq_to_migrate) - $silver_fmax) / 10)))))"
102   sched_upmigrate=`cat /proc/sys/walt/sched_upmigrate`
103   sched_downmigrate=`cat /proc/sys/walt/sched_downmigrate`
104   sched_upmigrate=${sched_upmigrate:0:2}
105   sched_downmigrate=${sched_downmigrate:0:2}
106   gold_early_upmigrate="$(((1024 * 100 / $sched_upmigrate)))"
107   gold_early_downmigrate="$(((1024 * 100 / $sched_downmigrate)))"
108   echo $silver_early_downmigrate $gold_early_downmigrate > /proc/sys/walt/sched_early_downmigrate
109   echo $silver_early_upmigrate $gold_early_upmigrate > /proc/sys/walt/sched_early_upmigrate
```

https://github.com/crdroidandroid/android_device_oneplus_sm8550-common/blob/15.0/init/init.kernel.post_boot-kalama.sh (accessed 04/11/2025).

The power management quality of service (PM QoS) API allows drivers to specify the latency requirement (in microseconds). If the wake-up latency of a CPU core Sleep state is longer than the specified QoS latency, then the CPU core does not enter the respective sleep state.

https://docs.qualcomm.com/bundle/publicresource/topics/80-70014-30/idlepowermanagement.html (accessed 04/11/2025).

For each CPU in the system, there is a `/sys/devices/system/cpu<N>/cpuidle/` directory in sysfs, where the number `<N>` is assigned to the given CPU at the initialization time. That directory contains a set of subdirectories called `state0`, `state1` and so on, up to the number of idle state objects defined for the given CPU minus one. Each of these directories corresponds to one idle state object and the larger the number in its name, the deeper the (effective) idle state represented by it.

Each of them contains a number of files (attributes) representing the properties of the idle state object corresponding to it, as follows:

**above**
> Total number of times this idle state had been asked for, but the observed idle duration was certainly too short to match its target residency.

**below**
> Total number of times this idle state had been asked for, but cerainly a deeper idle state would have been a better match for the observed idle duration.

**desc**
> Description of the idle state.

**disable**
> Whether or not this idle state is disabled.

**latency**
> Exit latency of the idle state in microseconds.

**name**
> Name of the idle state.

**power**
> Power drawn by hardware in this idle state in milliwatts (if specified, 0 otherwise).

**residency**
> Target residency of the idle state in microseconds.

**time**
   Total time spent in this idle state by the given CPU (as measured by the kernel) in microseconds.

**usage**
   Total number of times the hardware has been asked by the given CPU to enter this idle state.

https://www.kernel.org/doc/html/v5.0/admin-guide/pm/cpuidle.html (accessed 04/11/2025).

The desc and name files both contain strings. The difference between them is that the name is expected to be more concise, while the description may be longer and it may contain white space or special characters. The other files listed above contain integer numbers.

The disable attribute is the only writeable one. If it contains 1, the given idle state is disabled for this particular CPU, which means that the governor will never select it for this particular CPU and the CPUIdle driver will never ask the hardware to enter it for that CPU as a result. However, disabling an idle state for one CPU does not prevent it from being asked for by the other CPUs, so it must be disabled for all of them in order to never be asked for by any of them. [Note that, due to the way the ladder governor is implemented, disabling an idle state prevents that governor from selecting any idle states deeper than the disabled one too.]

If the disable attribute contains 0, the given idle state is enabled for this particular CPU, but it still may be disabled for some or all of the other CPUs in the system at the same time. Writing 1 to it causes the idle state to be disabled for this particular CPU and writing 0 to it allows the governor to take it into consideration for the given CPU and the driver to ask for it, unless that state was disabled globally in the driver (in which case it cannot be used at all).

*Id.*

121.     Qualcomm has indirectly infringed, and continues to indirectly infringe, the '943 Patent under 35 U.S.C. § 271(b) by actively inducing the infringement of the '943 Patent by others, such as its subsidiaries and affiliates, original equipment manufacturers, customers, resellers, retailers, and other parties. These others directly infringe the '943 Patent by, for example, making, using, testing, selling, offering for sale throughout, or importing into the United States, including this judicial District, downstream products (for example, without limitation, the exemplary

OnePlus 13R and Nothing Phone (2) smartphones) incorporating the products that infringe (for example, without limitation, the Exemplary Qualcomm SoCs). Qualcomm has induced and continues to induce such direct infringement by encouraging and facilitating others' infringing acts. For example, Qualcomm hires permanent sales and/or marketing personnel located throughout the United States, and in this judicial District. On information and belief, these sales and/or marketing personnel are engaged in activities that are targeted to original equipment manufacturers, customers, resellers, retailers, and other parties, including original equipment manufacturers, customers, resellers, retailers, and other parties based in the United States, including instructions for making, using, testing, or selling the products that infringe.

122.    Qualcomm specifically intended or intends these others, such as its subsidiaries and affiliates, original equipment manufacturers, customers, resellers, retailers, and other parties, to infringe the '943 Patent and knew or knows that the induced acts of these others constitute direct infringement. For example, although Qualcomm has notice of the '943 Patent, the scope of the claims, and the products covered thereby, Qualcomm nonetheless intentionally and knowingly encourages and facilitates these others to make, use, test, sell, offer for sale in, or import into, such covered products into the United States and thereby directly infringe the '943 Patent. Additionally, for example, Qualcomm designed the products that infringe (for example, without limitation, the Exemplary Qualcomm SoCs) such that they would each infringe the '943 Patent if made, used, tested, sold, offered for sale, or imported into the United States. Qualcomm provided, directly, or indirectly, the products that infringe to others, such as, but not limited to, customers, knowing and intending that those others use, test, sell, offer for sale, and/or import in and into the United States downstream products (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones) that incorporate the products that infringe (for example, without limitation,

the Exemplary Qualcomm SoCs), thereby directly infringing one or more claims of the '943 Patent.

123.    Qualcomm has also indirectly infringed and continues to indirectly infringe the '943 Patent under 35 U.S.C. § 271(c) by materially contributing to infringement of the '943 Patent by its subsidiaries and affiliates, original equipment manufacturers, customers, resellers, retailers, and other third parties by selling the products that infringe. The products that infringe (for example, without limitation, the Exemplary Qualcomm SoCs) have no substantial non-infringing uses and are a material part of the invention. Moreover, the products that infringe provide vital functionality to downstream products (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones). Further, the products that infringe cannot be used without being incorporated into a downstream product. Thus, any manufacture, use, test, sale, offer for sale, or importation in or into the United States of a product that infringes or a downstream product incorporating a product that infringes, infringes the '943 Patent.

124.    Defendants Nothing Technology and OnePlus have indirectly infringed and continue to indirectly infringe the '350 Patent under 35 U.S.C. § 271(b) by actively inducing the infringement of the '350 Patent by others, such as their subsidiaries and affiliates, customers (including end-users), resellers, retailers, and other third parties. These others directly infringe the '350 Patent by, for example, making, using, testing, selling, offering for sale throughout, or importing into the United States and this judicial District, the products that infringe (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones). Defendants Nothing Technology and OnePlus induced or induce such direct infringement by encouraging and facilitating others' infringing acts. For example, upon information and belief, Defendants Nothing Technology and OnePlus market, advertise, sell and/or offer for sale, products that infringe throughout the United States and in this judicial District. Upon information and belief, these

marketing, advertising, and/or sales activities are targeted towards customers (including end-users), including providing instructions on the use of the products that infringe, throughout the United States and in this judicial District.

125.    Defendants Nothing Technology and OnePlus specifically intended or intend these others, such as their subsidiaries and affiliates, customers (including end-users), resellers, retailers, and other third parties to infringe the '350 Patent and knew or know that the induced acts of these others constitute direct infringement. For example, although Defendants Nothing Technology and OnePlus have notice of the '350 Patent, the scope of its claims, and the products covered thereby, Defendants Nothing Technology and OnePlus nonetheless intentionally and knowingly encourage and facilitate these others to make, use, test, sell, offer for sale in, or import into, such covered products into the United States and thereby infringe the '350 Patent. Additionally, for example, Defendants Nothing Technology and OnePlus designed the products that infringe (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones) such that they would each infringe the '350 Patent if made, used, tested, sold, offered for sale, or imported in and into the United States. Defendants Nothing Technology and OnePlus provided, directly or indirectly, products that infringe to others, such as, but not limited to, their subsidiaries and affiliates, customers (including end-users), resellers, retailers, and other third parties, knowing and intending that those others use, test, sell, offer for sale, and/or import into the United States products that infringe (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones), thereby infringing one or more claims of the '350 Patent.

126.    Defendants Nothing Technology and OnePlus have also indirectly infringed and continue to indirectly infringe the '350 Patent under 35 U.S.C. § 271(c) by materially contributing to the infringement of the '350 Patent by their subsidiaries and affiliates, customers (including

end-users), resellers, retailers and/or other third parties by selling the products that infringe. The products that infringe (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones) have no substantial non-infringing uses and are a material part of the invention. Thus, any manufacture, use, test, sale, offer for sale, or importation in or into the United States of a products that infringe, infringes the '350 Patent.

127.    As a result of Defendants Qualcomm's, Nothing Technology's, and OnePlus's infringement of the '350 Patent, Onesta is entitled to monetary damages in an amount adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants, together with interest and costs as fixed by the Court.

128.    Despite actual notice of their infringement since as early as the filing of the present Complaint, Defendants' acts of direct and indirect infringement of the '350 Patent are deliberate and willful, and have caused, and will continue to cause substantial damage and irreparable harm to Onesta, and Onesta has no adequate remedy at law.

## <u>COUNT IV</u>

## <u>Infringement of the '019 Patent</u>

129.    Onesta incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

130.    Defendants Qualcomm, Nothing Technology, and OnePlus have directly and indirectly infringed, and continued to directly and indirectly infringe, the '019 Patent by making, having made, using, selling, offering for sale, and/or importing into the United States products that infringe the '019 Patent. The products that infringe one or more claims of the '019 Patent include, without limitation, at least the products identified herein. Further discovery may reveal additional infringing products and/or models.

131.    For example, and without limitation, the infringing products infringe one or more

claims of the '019 Patent, including but not limited to claim 11. The products that infringe fall within the scope of and include, either literally or under the doctrine of equivalents, all of the elements of at least claim 11 of the '019 Patent.

132.    The products that infringe include all the limitations of at least claim 11 of the '019 Patent. Specifically, the '019 Patent claims, *e.g.*, a computer system comprising: a plurality of processors; a shared memory; and a mapper, wherein the mapper is configured to: receive a memory operation from a processor that references an address in the shared memory; map the received memory operation to at least one virtual memory pool to produce a mapping result, wherein the at least one virtual memory pool is associated with at least one memory resource; and provide the mapping result to the processor.

133.    With respect to exemplary devices, the OnePlus 13R smartphone, made or sold by OnePlus, incorporating the Qualcomm Snapdragon 8 Gen 3 processor, directly infringes at least claim 11 of the '019 Patent.



https://www.oneplus.com/us/oneplus-13r (accessed 04/11/2025).

134.    Another exemplary device, the Nothing Phone (2) smartphone, made or sold by Nothing, incorporating the Qualcomm Snapdragon 8+ Gen 1 processor, directly infringes at least claim 11 of the '019 Patent.



https://us.nothing.tech/pages/phone-2 (accessed 04/11/2025).

135.    For example, the Qualcomm Snapdragon 8 Gen 3 and Snapdragon 8+ Gen 1, processors (again, the "Exemplary Qualcomm SoCs") are Qualcomm's mobile processors and incorporate a substantially similar Kryo CPU and an Adreno 700 series GPU.

**CPU**

| Architecture | |
|---|---|
| | 1x 3.3 GHz – Cortex-X4 |
| | 3x 3.15 GHz – Cortex-A720 |
| | 2x 2.96 GHz – Cortex-A720 |
| | 2x 2.27 GHz – Cortex-A520 |

https://nanoreview.net/en/soc/qualcomm-snapdragon-8-gen-3 (accessed 04/11/2025); *see also*

https://docs.qualcomm.com/bundle/publicresource/87-71408-

1_REV_G_Snapdragon_8_gen_3_Mobile_Platform_Product_Brief.pdf (accessed 04/11/2025).

**CPU**

| Architecture | |
|---|---|
| | 1x 3.2 GHz – Cortex-X2 |
| | 3x 2.75 GHz – Cortex-A710 |
| | 4x 2 GHz – Cortex-A510 |

https://nanoreview.net/en/soc/snapdragon-8-plus-gen-1    (accessed    04/11/2025);    *see    also*

https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/Snapdragon-8-

plus-Gen-1-Product-Brief.pdf (accessed 04/11/2025).

136.    Upon information and belief, the Defendants' exemplary products include a shared

memory. For example, the exemplary OnePlus 13R and Nothing Phone (2) smartphones include a

system memory.

## Performance

Operating System: OxygenOS 15.0 based on Android™ 15
Platform: Snapdragon® 8 Gen 3 Mobile Platform
CPU: Qualcomm® Kryo™ 980 CPU @3.3GHz
GPU: Adreno™ 750 @903MHz
RAM: 12GB LPDDR5X
Storage: 256GB UFS 4.0
Battery: 6,000 mAh (single-cell 6,000 mAh, non-removable)
Vibration: Haptic motor
Available configurations: 12GB+256GB

https://www.oneplus.com/us/oneplus-13r (accessed 04/11/2025).

| Processor | Qualcomm Snapdragon 8+ Gen 1 |
|---|---|
| Capacity | 8GB RAM + 128GB storage<br>12GB RAM + 256GB storage<br>12GB RAM + 512GB storage |

https://us.nothing.tech/pages/phone-

2?srsltid=AfmBOopFPc7Hi1OYSNe1ieSzdJtZEwzXrpQupehojuobQVzikVYOFSu0#spec

(accessed 04/11/2025).

# Memory

RAM is used for all memory allocations made by the software. Effective management of RAM is crucial to meet performance requirements and ensure the smooth functioning of applications.



**Figure : Memory partitioning**

Certain sections of RAM are managed independently of the Linux system. For example, firmware such as modem, video, and audio run from these specific RAM partitions. The Linux kernel manages all other RAM partitions.

The Linux kernel features its own memory management subsystem, which includes the following components:

- Implementation of virtual memory and demand paging
- Memory allocation for both kernel internal structures and user space programs
- Mapping of files into the address space of the processes
- Other memory management operations

- Shared memory is a common block of memory that is mapped into the address spaces of two or more processes.
- To check the shared memory usage, run the following command:

```
cat /proc/meminfo | grep -i shmem
```

https://docs.qualcomm.com/bundle/publicresource/topics/80-70014-10/2-performance-features.html (accessed 04/11/2025).

137.    Further, for example, the Adreno GPU implements a "unified memory architecture" and supports shared virtual memory (SVM).

A key advantage of the Adreno GPU is its unified memory architecture, where the CPU and GPU share a single address space. This eliminates data transfer bottlenecks, allowing compute tasks like the ALF to operate directly on the shared memory without memory transfers. For more details, consult the OpenCL Programming guide and the Adreno OpenCL SDK examples.

https://www.qualcomm.com/developer/blog/2024/04/offload-tough-workloads-to-adreno-gpus--acceleration-of-the-adap (accessed 04/11/2025).

> With the support of SVM in OpenCL 2.0, the host and devices can share pointers and complex data structures that may contain pointers. In addition, SVM in OpenCL 2.0 also defines the memory consistency model so that the host and kernel can interact with each other using atomics for synchronization. This allows developers to write highly interactive parallel code between device and host with minimum synchronization costs.

https://docs.qualcomm.com/bundle/publicresource/80-NB295-11_REV_C_Qualcomm_Snapdragon_Mobile_Platform_Opencl_General_Programming_and_Optimization.pdf, at p. 21 (accessed 04/11/2025).

138.    In addition, on information and belief, the Defendants' exemplary products include a mapper configured to receive a memory operation from a processor that references an address in the shared memory; map the received memory operation to at least one virtual memory pool to produce a mapping result, wherein the at least one virtual memory pool is associated with at least one memory resource; and provide the mapping result to the processor. For example, the Exemplary Qualcomm SoC includes memory controller(s), system memory management unit (SMMU), GPU memory management unit (GPU MMU), and/or associated software.



https://www.anandtech.com/show/21445/qualcomm-snapdragon-x-architecture-deep-dive

(accessed 04/11/2025).



https://www.anandtech.com/show/21445/qualcomm-snapdragon-x-architecture-deep-dive/3

(accessed 04/11/2025).



https://www.anandtech.com/show/21445/qualcomm-snapdragon-x-architecture-deep-dive/2

(accessed 04/11/2025).



https://www.anandtech.com/show/21445/qualcomm-snapdragon-x-architecture-deep-dive/2

(accessed 04/11/2025).

**SMMU**

The SMMU is a hardware component that performs address translation and access control for bus initiators outside of the CPU. The detailed design of an SMMU can be found in the ARM specifications [3]. This document provides only a high-level introduction to how SMMUs are used in access control on Snapdragon SoCs.

An SMMU can perform two stages of address translation. Stage 1, usually controlled by the CPU OS, maps the virtual addresses visible to applications and the OS kernel to intermediate physical addresses visible to a virtual machine. Stage 2 maps intermediate physical addresses to physical addresses. At each stage, the address mappings – encoded in SW-managed *page tables* – can leave some target address ranges unmapped and restrict the transaction types permitted on others, defining the access control policy to physical address space. This allows a kernel driver in a virtual machine, for example, to allocate a memory buffer, provide a DMA bus initiator with its virtual address range, and rely on the SMMU to translate DMA transactions to the correct physical address ranges for the virtual machine. An SMMU can also ensure that SW does not use DMA bus initiators to circumvent the access control policy imposed on it. Transactions targeting an address not mapped or permitted in the page tables will trigger a bus fault.

https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/whitepaper_0.pdf, p. 6 (accessed 04/11/2025).

Arm SMMUs provide:

**Translation**
The addresses supplied by the client device are translated from the virtual address space into the system's physical address space.

https://documentation-service.arm.com/static/64f59fb3bc48b0381ce07226?token=, p. 8 (accessed 04/11/2025).

139.    Upon information and belief, the mapper is configured to receive a memory operation from a processor that references an address in the shared memory; map the received memory operation to at least one virtual memory pool to produce a mapping result, wherein the at least one virtual memory pool is associated with at least one memory resource; and provide the mapping result to the processor. https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/whitepaper_0.pdf    (accessed    04/11/2025);    https://documentation-service.arm.com/static/64f59fb3bc48b0381ce07226?token= (accessed 04/11/2025).

With the support of SVM in OpenCL 2.0, the host and devices can share pointers and complex data structures that may contain pointers. In addition, SVM in OpenCL 2.0 also defines the memory consistency model so that the host and kernel can interact with each other using atomics for synchronization. This allows developers to write highly interactive parallel code between device and host with minimum synchronization costs.

https://docs.qualcomm.com/bundle/publicresource/80-NB295-

11_REV_C_Qualcomm_Snapdragon_Mobile_Platform_Opencl_General_Programming_and_Op

timization.pdf, at p. 21 (accessed 04/11/2025).

As an essential and advanced feature introduced to the OpenCL 2.0 standard, SVM allows the host and the device to share and access the same memory space and avoid excessive data copy, e.g., accessing the host pointer on the OpenCL device is now possible.

*Id.* at 59.

The host program usually runs on top of an operating system (OS) with virtual addressing, such as Linux. Hence, pointers in the host software carry 'virtual addresses' assigned by the OS. SVM ensures that host pointers are meaningful on the device. The first two modes require the explicit allocation of SVM buffers with the OpenCL `clSVMAlloc` function and, when the pointer to this buffer is passed to the kernel, it must be explicitly declared as an SVM pointer. In contrast, fine-grained system SVM provides the highest level of abstraction because each kernel on the device can access any pointer: those explicitly allocated with `clSVMAlloc` and those returned by the regular `malloc`/`new` functions. Fig. 1 (right) shows the fine-grained system SVM mode. This paper focuses on this mode, and specifically on the right-hand part of Fig. 1. The other modes can be easily implemented with the developed building blocks described in Section IV.

https://cas.ee.ic.ac.uk/people/gac1/pubs/FelixFPT17.pdf, at p. 2 (accessed 04/11/2025).

140.    Qualcomm has indirectly infringed, and continues to indirectly infringe, the '019 Patent under 35 U.S.C. § 271(b) by actively inducing the infringement of the '019 Patent by others, such as its subsidiaries and affiliates, original equipment manufacturers, customers, resellers, retailers, and other parties. These others directly infringe the '019 Patent by, for example, making, using, testing, selling, offering for sale throughout, or importing into, the United States, including

this judicial District, downstream products (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones) incorporating the products that infringe (for example, without limitation, the Exemplary Qualcomm SoCs). Qualcomm induced and induces such direct infringement by encouraging and facilitating others' infringing acts. For example, Qualcomm hires permanent sales and/or marketing personnel located throughout the United States, and in this judicial District. On information and belief, these sales and/or marketing personnel engaged in activities that are targeted to original equipment manufacturers, customers, resellers, retailers, and other parties, including original equipment manufacturers, customers, resellers, retailers, and other parties, based in the United States, including instructions for making, using, testing, or selling the products that infringe.

141.    Qualcomm specifically intended or intends these others, such as its subsidiaries and affiliates, original equipment manufacturers, customers, resellers, retailers, and other parties, to infringe the '019 Patent and knew or knows that the induced acts of these others constitute direct infringement. For example, although Qualcomm has notice of the '019 Patent, the scope of its claims, and the products covered thereby, Qualcomm nonetheless intentionally and knowingly encourages and facilitates these others to make, use, test, sell, offer for sale in, or import into, such covered products into the United States and thereby directly infringe the '019 Patent. Additionally, for example, Qualcomm designed the products that infringe (for example, without limitation, the Exemplary Qualcomm SoCs) such that they would each infringe the '019 Patent if made, used, tested, sold, offered for sale, or imported into the United States. Qualcomm provided, directly, or indirectly, the products that infringe to others, such as, but not limited to, customers, knowing and intending that those others use, test, sell, offer for sale, and/or import in and into the United States downstream products (for example, without limitation, the exemplary OnePlus 13R and Nothing

Phone (2) smartphones ) that incorporate the products that infringe (for example, without limitation, the Exemplary Qualcomm SoCs), thereby directly infringing one or more claims of the '019 Patent.

142.    Qualcomm has also indirectly infringed and continues to indirectly infringe the '019 Patent under 35 U.S.C. § 271(c) by materially contributing to infringement of the '019 Patent by its subsidiaries and affiliates, original equipment manufacturers, customers, resellers, retailers, and/or other third parties by selling the products that infringe. The products that infringe (for example, without limitation, the Exemplary Qualcomm SoCs) have no substantial non-infringing uses and are a material part of the invention. Moreover, the products that infringe provide vital functionality to downstream products (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones). Further, the products that infringe cannot be used without being incorporated into a downstream product. Thus, any manufacture, use, test, sale, offer for sale, or importation in or into the United States of a product that infringes or a downstream product incorporating a product that infringes, infringes the '019 Patent.

143.    Defendants Nothing Technology and OnePlus have indirectly infringed and continue to indirectly infringe the '019 Patent under 35 U.S.C. § 271(b) by actively inducing the infringement of the '019 Patent by others, such as their subsidiaries and affiliates, customers (including end-users), resellers, retailers, and other third parties. These others directly infringe the '019 Patent by, for example, making, using, testing, selling, offering for sale throughout, or importing into, the United States, including this judicial District, products that infringe (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones). Defendants Nothing Technology and OnePlus induced and induce such direct infringement by encouraging and facilitating others' infringing acts. For example, upon information and belief, Defendants Nothing Technology and OnePlus market, advertise, sell and/or offer for sale, products

that infringe throughout the United States and in this judicial District. Upon information and belief, these marketing, advertising, and/or sales activities are targeted towards customers (including end-users), including providing instructions on the use of the products that infringe, throughout the United States and in this judicial District.

144.    Defendants Nothing Technology and OnePlus specifically intended or intend these others, such as their affiliates and subsidiaries, customers (including end-users), resellers, retailers, and other third parties to infringe the '019 Patent and knew or know that the induced acts of these others constitute direct infringement. For example, although Defendants Nothing Technology and OnePlus have notice of the '019 Patent, the scope of its claims, and the products covered thereby, Defendants Nothing Technology and OnePlus nonetheless intentionally and knowingly encourage and facilitate these others to make, use, test, sell, offer for sale in, or import into, such covered products into the United States and thereby directly infringe the '019 Patent. Additionally, for example, Defendants designed the products that infringe (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones) such that they would each infringe the '019 Patent if made, used, tested, sold, offered for sale, or imported in and into the United States. Defendants provided, directly or indirectly, products that infringe to others, such as, but not limited to, their subsidiaries and affiliates, customers (including end-users), resellers, retailers, and other third parties, knowing and intending that those others use, sell, offer for sale, and/or import into the United States products that infringe (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones), thereby infringing one or more claims of the '019 Patent.

145.    Defendants have also indirectly infringed and continue to indirectly infringe the '019 Patent under 35 U.S.C. § 271(c) by materially contributing to the infringement of the '019

Patent by their subsidiaries and affiliates, customers (including end-users), resellers, retailers, and/or other third parties by selling the products that infringe. The products that infringe (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones) have no substantial non-infringing uses and are a material part of the invention. Thus, any manufacture, use, test, sale, offer for sale, or importation in or into the United States of the products that infringe, infringes the '019 Patent.

146.    As a result of Defendants' infringement of the '019 Patent, Onesta is entitled to monetary damages in an amount adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants, together with interest and costs as fixed by the Court.

147.    Despite actual notice of their infringement since as early as the filing of the present Complaint, Nothing Technology's and OnePlus' acts of direct and indirect infringement of the '019 Patent are deliberate and willful, and have caused, and will continue to cause substantial damage and irreparable harm to Onesta, and Onesta has no adequate remedy at law.

## COUNT V

## Infringement of the '809 Patent

148.    Onesta incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

149.    Defendants Qualcomm, Nothing Technology, and OnePlus have directly and indirectly infringed, and continued to directly and indirectly infringe, the '809 Patent by making, having made, using, selling, offering for sale, and/or importing into the United States products that infringe the '809 Patent. The products that infringe one or more claims of the '809 Patent include, without limitation, at least the products identified herein. Further discovery may reveal additional infringing products and/or models.

150.    For example, and without limitation, the infringing products infringe one or more claims of the '809 Patent, including but not limited to claim 1. The products that infringe fall within the scope of and include, either literally or under the doctrine of equivalents, all of the elements of at least claim 1 of the '809 Patent.

151.    The products that infringe include all the limitations of at least claim 1 of the '809 Patent. Specifically, the '809 Patent claims, *e.g.*, a method of allocating memory to a memory operation executed by a processor in a computer arrangement having a first processor configured for unified operation with a second processor, comprising: receiving a memory operation from a processor; mapping the memory operation to one of a plurality of memory heaps, wherein the memory operation references a shared memory address (SMA) in a shared memory, and wherein the mapping includes mapping the memory operation to one of a plurality of memory heaps based on the SMA, wherein the mapping produces a mapping result; and providing the mapping result to the processor.

152.    With respect to exemplary devices, the OnePlus 13R smartphone, made or sold by OnePlus, incorporating the Qualcomm Snapdragon 8 Gen 3 processor and associated software, directly infringes at least claim 1 of the '809 Patent.



Unleash the Speed

Say bye to 8GB, and hi to 12GB LPDDR5X

Snapdragon® 8 Gen 3
Up to 98% faster AI, 30% faster CPU, 25% faster GPU

LPDDR5X
33% faster than LPDDR5, 20% more efficient than LPDDR5

## Performance

Operating System: OxygenOS 15.0 based on Android™ 15
Platform: Snapdragon® 8 Gen 3 Mobile Platform
CPU: Qualcomm® Kryo™ 980 CPU @3.3GHz
GPU: Adreno™ 750 @903MHz
RAM: 12GB LPDDR5X
Storage: 256GB UFS 4.0
Battery: 6,000 mAh (single-cell 6,000 mAh, non-removable)
Vibration: Haptic motor
Available configurations: 12GB+256GB

https://www.oneplus.com/us/oneplus-13r (accessed 04/11/2025).

153.    Another exemplary device, the Nothing Phone (2) smartphone, made or sold by Nothing, incorporating the Qualcomm Snapdragon 8+ Gen 1 processor and associated software, directly infringes at least claim 1 of the '809 Patent.



https://us.nothing.tech/pages/phone-2 (accessed 04/11/2025).

154.    Upon information and belief, the Defendant's exemplary products perform a method of allocating memory to a memory operation executed by a processor in a computer arrangement having a first processor configured for unified operation with a second processor. For example, the Qualcomm Snapdragon 8 Gen 3 and Snapdragon 8+ Gen 1, processors (again, the

"Exemplary Qualcomm SoCs") are Qualcomm's mobile processors and incorporate a substantially similar Kryo CPU and an Adreno 700 series GPU.

🔳 CPU

Architecture                    1x 3.3 GHz – Cortex-X4
                                3x 3.15 GHz – Cortex-A720
                                2x 2.96 GHz – Cortex-A720
                                2x 2.27 GHz – Cortex-A520

https://nanoreview.net/en/soc/qualcomm-snapdragon-8-gen-3 (accessed 04/11/2025); *see also* https://docs.qualcomm.com/bundle/publicresource/87-71408-1_REV_G_Snapdragon_8_gen_3_Mobile_Platform_Product_Brief.pdf (accessed 04/11/2025).

🔳 CPU

Architecture                    1x 3.2 GHz – Cortex-X2
                                3x 2.75 GHz – Cortex-A710
                                4x 2 GHz – Cortex-A510

https://nanoreview.net/en/soc/snapdragon-8-plus-gen-1 (accessed 04/11/2025); *see also* https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/Snapdragon-8-plus-Gen-1-Product-Brief.pdf (accessed 04/11/2025).

155.    Upon information and belief, the Defendant's exemplary products receive a memory operation from a processor, wherein the memory operation references a shared memory address (SMA) in a shared memory. For example, the exemplary products include a system memory.

## Performance

Operating System: OxygenOS 15.0 based on Android™ 15
Platform: Snapdragon® 8 Gen 3 Mobile Platform
CPU: Qualcomm® Kryo™ 980 CPU @3.3GHz
GPU: Adreno™ 750 @903MHz
RAM: 12GB LPDDR5X
Storage: 256GB UFS 4.0
Battery: 6,000 mAh (single-cell 6,000 mAh, non-removable)
Vibration: Haptic motor
Available configurations: 12GB+256GB

https://www.oneplus.com/us/oneplus-13r (accessed 04/11/2025).

| Processor | Qualcomm Snapdragon 8+ Gen 1 |
|---|---|
| Capacity | 8GB RAM + 128GB storage<br>12GB RAM + 256GB storage<br>12GB RAM + 512GB storage |

https://us.nothing.tech/pages/phone-

2?srsltid=AfmBOopFPc7Hi1OYSNe1ieSzdJtZEwzXrpQupehojuobQVzikVYOFSu0#spec

(accessed 04/11/2025).

# Memory

RAM is used for all memory allocations made by the software. Effective management of RAM is crucial to meet performance requirements and ensure the smooth functioning of applications.



**Figure : Memory partitioning**

Certain sections of RAM are managed independently of the Linux system. For example, firmware such as modem, video, and audio run from these specific RAM partitions. The Linux kernel manages all other RAM partitions.

The Linux kernel features its own memory management subsystem, which includes the following components:

- Implementation of virtual memory and demand paging
- Memory allocation for both kernel internal structures and user space programs
- Mapping of files into the address space of the processes
- Other memory management operations

---

- Shared memory is a common block of memory that is mapped into the address spaces of two or more processes.
- To check the shared memory usage, run the following command:

```
cat /proc/meminfo | grep -i shmem
```

https://docs.qualcomm.com/bundle/publicresource/topics/80-70014-10/2-performance-features.html (accessed 04/11/2025).

156.    Further, for example, the Adreno GPU implements a "unified memory architecture" and supports shared virtual memory (SVM).

A key advantage of the Adreno GPU is its unified memory architecture, where the CPU and GPU share a single address space. This eliminates data transfer bottlenecks, allowing compute tasks like the ALF to operate directly on the shared memory without memory transfers. For more details, consult the OpenCL Programming guide and the Adreno OpenCL SDK examples.

https://www.qualcomm.com/developer/blog/2024/04/offload-tough-workloads-to-adreno-gpus--acceleration-of-the-adap (accessed 04/11/2025).

157.    With the support of SVM, the Adreno GPU and Kryo CPU "can share pointers and complex data structures that may contain pointers."

With the support of SVM in OpenCL 2.0, the host and devices can share pointers and complex data structures that may contain pointers. In addition, SVM in OpenCL 2.0 also defines the memory consistency model so that the host and kernel can interact with each other using atomics for synchronization. This allows developers to write highly interactive parallel code between device and host with minimum synchronization costs.

https://docs.qualcomm.com/bundle/publicresource/80-NB295-11_REV_C_Qualcomm_Snapdragon_Mobile_Platform_Opencl_General_Programming_and_Optimization.pdf, at p. 21 (accessed 04/11/2025).

158.    In addition, on information and belief, the Defendants' exemplary products map the memory operation to one of a plurality of memory heaps, wherein the mapping includes mapping the memory operation to one of a plurality of memory heaps based on the SMA, wherein the mapping produces a mapping result, and provide the mapping result to the processor. For example, the Exemplary Qualcomm SoCs, upon information and belief, are configured to map the memory operation to one of a plurality of memory heaps, wherein the mapping is based on the SMA, and wherein the mapping produces a mapping result; and provide the mapping result to the Adreno GPU or the Kryo CPU.

With the support of SVM in OpenCL 2.0, the host and devices can share pointers and complex data structures that may contain pointers. In addition, SVM in OpenCL 2.0 also defines the memory consistency model so that the host and kernel can interact with each other using atomics for synchronization. This allows developers to write highly interactive parallel code between device and host with minimum synchronization costs.

https://docs.qualcomm.com/bundle/publicresource/80-NB295-11_REV_C_Qualcomm_Snapdragon_Mobile_Platform_Opencl_General_Programming_and_Optimization.pdf, at p. 21 (accessed 04/11/2025).

As an essential and advanced feature introduced to the OpenCL 2.0 standard, SVM allows the host and the device to share and access the same memory space and avoid excessive data copy, e.g., accessing the host pointer on the OpenCL device is now possible.

*Id.* at 59.

The host program usually runs on top of an operating system (OS) with virtual addressing, such as Linux. Hence, pointers in the host software carry 'virtual addresses' assigned by the OS. SVM ensures that host pointers are meaningful on the device. The first two modes require the explicit allocation of SVM buffers with the OpenCL `clSVMAlloc` function and, when the pointer to this buffer is passed to the kernel, it must be explicitly declared as an SVM pointer. In contrast, fine-grained system SVM provides the highest level of abstraction because each kernel on the device can access any pointer: those explicitly allocated with `clSVMAlloc` and those returned by the regular `malloc`/`new` functions. Fig. 1 (right) shows the fine-grained system SVM mode. This paper focuses on this mode, and specifically on the right-hand part of Fig. 1. The other modes can be easily implemented with the developed building blocks described in Section IV.

https://cas.ee.ic.ac.uk/people/gac1/pubs/FelixFPT17.pdf, at p. 2 (accessed 04/11/2025).

**SMMU**

The SMMU is a hardware component that performs address translation and access control for bus initiators outside of the CPU. The detailed design of an SMMU can be found in the ARM specifications [3]. This document provides only a high-level introduction to how SMMUs are used in access control on Snapdragon SoCs.

An SMMU can perform two stages of address translation. Stage 1, usually controlled by the CPU OS, maps the virtual addresses visible to applications and the OS kernel to intermediate physical addresses visible to a virtual machine. Stage 2 maps intermediate physical addresses to physical addresses. At each stage, the address mappings – encoded in SW-managed *page tables* – can leave some target address ranges unmapped and restrict the transaction types permitted on others, defining the access control policy to physical address space. This allows a kernel driver in a virtual machine, for example, to allocate a memory buffer, provide a DMA bus initiator with its virtual address range, and rely on the SMMU to translate DMA transactions to the correct physical address ranges for the virtual machine. An SMMU can also ensure that SW does not use DMA bus initiators to circumvent the access control policy imposed on it. Transactions targeting an address not mapped or permitted in the page tables will trigger a bus fault.

https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/whitepaper_0.pdf, p. 6 (accessed 04/11/2025).

Arm SMMUs provide:

**Translation**

The addresses supplied by the client device are translated from the virtual address space into the system's physical address space.

https://documentation-service.arm.com/static/64f59fb3bc48b0381ce07226?token=, p. 8 (accessed 04/11/2025).

159.    Qualcomm has indirectly infringed, and continues to indirectly infringe, the '809 Patent under 35 U.S.C. § 271(b) by actively inducing the infringement of the '809 Patent by others, such as its subsidiaries and affiliates, original equipment manufacturers, customers, resellers, retailers, and other parties. These others directly infringe the '809 Patent by, for example, making, using, testing, selling, offering for sale throughout, or importing into, the United States, including this judicial District, downstream products (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones) incorporating the products that infringe (for example, without limitation, the Exemplary Qualcomm SoC). Qualcomm induced and induces such direct infringement by encouraging and facilitating others' infringing acts. For example, Qualcomm hires permanent sales and/or marketing personnel located throughout the United States, and in this judicial District. On information and belief, these sales and/or marketing personnel engaged in activities that are targeted to original equipment manufacturers, customers, resellers, retailers, and other parties, including original equipment manufacturers, customers, resellers, retailers, and other parties, based in the United States, including instructions for making, using, testing, or selling the products that infringe.

160.    Qualcomm specifically intended or intends these others, such as its subsidiaries and affiliates, original equipment manufacturers, customers, resellers, retailers and other parties, to infringe the '809 Patent and knew or knows that the induced acts of these others constitute direct infringement. Additionally, for example, although Qualcomm has notice of the '809 Patent, the scope of its claims, and the products covered thereby, Qualcomm nonetheless intentionally and knowingly encourages and facilitates these others to make, use, test, sell, offer for sale in, or import

into, such covered products into the United States and thereby directly infringe the '809 Patent. For example, Qualcomm designed the products that infringe (for example without limitation the Exemplary Qualcomm SoCs) such that they would each infringe the '809 Patent if made, used, tested, sold, offered for sale, or imported into the United States. Qualcomm provided, directly, or indirectly, the products that infringe to others, such as, but not limited to, customers, knowing and intending that those others use, test, sell, offer for sale, and/or import in and into the United States downstream products (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones) that incorporate the products that infringe (for example without limitation the Exemplary Qualcomm SoC), thereby directly infringing one or more claims of the '809 Patent.

161.    Qualcomm has also indirectly infringed and continues to indirectly infringe the '809 Patent under 35 U.S.C. § 271(c) by materially contributing to infringement of the '809 Patent by its subsidiaries and affiliates, original equipment manufacturers, customers, resellers, retailers and other parties by selling the products that infringe. The products that infringe (for example, without limitation, the Exemplary Qualcomm SoCs) have no substantial non-infringing uses and are a material part of the invention. Moreover, the products that infringe provide vital functionality to downstream products (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones). Further, the products that infringe cannot be used without being incorporated into a downstream product. Thus, any manufacture, use, test, sale, offer for sale, or importation in or into the United States of a product that infringes or a downstream product incorporating a product that infringes, infringes the '809 Patent.

162.    Defendants Nothing Technology and OnePlus have indirectly infringed and continue to indirectly infringe the '809 Patent under 35 U.S.C. § 271(b) by actively inducing the infringement of the '809 Patent by others, such as their subsidiaries and affiliates, customers

(including end-users), resellers, retailers, and other third parties. These others directly infringe the '809 Patent by, for example, making, using, testing, selling, offering for sale throughout, or importing into the United States and this judicial District, products that infringe (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones). Defendants Nothing Technology and OnePlus induced or induces such direct infringement by encouraging and facilitating others' infringing acts. For example, upon information and belief, Defendants Nothing Technology and OnePlus market, advertise, sell and/or offer for sale, products that infringe throughout the United States and in this judicial District. Upon information and belief, these marketing, advertising, and/or sales activities are targeted towards customers (including end-users), including providing instructions on the use of the products that infringe, throughout the United States and in this judicial District.

163.    Defendants Nothing Technology and OnePlus specifically intended or intend these others, such as their subsidiaries and affiliates, customers (including end-users), resellers, retailers, and other third parties to infringe the '809 Patent and knew or know that the induced acts of these others constitute direct infringement. For example, although Defendants Nothing Technology and OnePlus have notice of the '809 Patent, the scope of its claims, and the products covered thereby, Defendants Nothing Technology and OnePlus nonetheless intentionally and knowingly encourage and facilitate these others to make, use, test, sell, offer for sale in, or import into, such covered products into the United States and thereby infringe the '809 Patent. Additionally, for example, Defendants Nothing Technology and OnePlus designed the products that infringe (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones) such that they would each infringe the '809 Patent if made, used, tested, sold, offered for sale, or imported in and into the United States. Defendants Nothing Technology and OnePlus provided, directly or

indirectly, products that infringe to others, such as, but not limited to, their subsidiaries and affiliates, customers (including end-users), resellers, retailers, and other third parties, knowing and intending that those others use, sell, offer for sale, and/or import into the United States products that infringe (for example, without limitation, the exemplary OnePlus 13R and Nothing Phone (2) smartphones), thereby infringing one or more claims of the '809 Patent.

164.    Defendants Nothing Technology and OnePlus have also indirectly infringed and continue to indirectly infringe the '809 Patent under 35 U.S.C. § 271(c) by materially contributing to the infringement of the '809 Patent by their subsidiaries and affiliates, customers, resellers, retailers, and/or other third parties by selling the products that infringe. The products that infringe (for example, without limitation, the Exemplary OnePlus 13R smartphone and the Exemplary Nothing Phone (2) smartphones) have no substantial non-infringing uses and are a material part of the invention. Thus, any manufacture, use, test, sale, offer for sale, or importation in or into the United States of the products that infringe, infringes the '809 Patent.

165.    As a result of Defendants Qualcomm's, Nothing Technology's, and OnePlus's infringement of the '809 Patent, Onesta is entitled to monetary damages in an amount adequate to compensate for Defendants' infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants, together with interest and costs as fixed by the Court.

166.    Despite actual notice of their infringement since as early as the filing of the present Complaint, Nothing Technology's and OnePlus' acts of direct and indirect infringement of the '809 Patent are deliberate and willful, and have caused, and will continue to cause substantial damage and irreparable harm to Onesta, and Onesta has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Onesta requests the Court grant the relief set forth below:

a.    Enter a judgment that Defendants have directly and/or indirectly infringed, and

continue to directly and/or indirectly infringe one or more claims of each of the Asserted Patents;

b.       Enter a judgment that Defendants' acts of patent infringement are willful;

c.       Order Defendants' to account for and pay damages caused to Onesta by Defendants unlawful acts of patent infringement;

d.       Award Onesta pre- and post-judgment interest on such damages and costs Onesta incurs in this action;

e.       Award Onesta increased damages and attorney fees pursuant to 35 U.S.C. §§ 284 and 285; and

f.       Grant Onesta other and further relief, including equitable relief, as the Court finds just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Onesta hereby demands a jury trial for all claims and issues deemed to be triable by a jury.

Dated: April 17, 2025                Respectfully submitted,

*/s/ Michael T. Renaud*
Michael T. Renaud (629783)
Adam Rizk (688305)
Samuel F. Davenport (636958)
William Meunier (*Pro hac vice* forthcoming)
Matthew A. Karambelas (691034)
Catherine Xu (*Pro hac vice* forthcoming)
Meena Seralathan (*Pro hac vice* forthcoming)
Courtney Herndon (693418)
Hannah M. Edge (*Pro hac vice* forthcoming)
Mintz Levin Cohn Ferris
 Glovsky and Popeo PC
One Financial Center
Boston, MA 02111
Tel: 617-542-6000
Fax: 617-542-2241
mtrenaud@mintz.com

arizk@mintz.com
sfdavenport@mintz.com
wameunier@mintz.com
makarambelas@mintz.com
cxu@mintz.com
mserelathan@mintz.com
cherndon@mintz.com
hmedge@mintz.com

Yanyi Liu (*Pro hac vice* forthcoming)
Mintz Levin Cohn Ferris
 Glovsky and Popeo PC
44 Montgomery Street, 36th Floor
San Francisco, CA 94104
Tel: (415) 432-6013
YLiu@mintz.com

*Of Counsel:*

Andrea L. Fair
Texas State Bar No. 24078488
andrea@millerfairhenry.com
Garrett Parish
Texas State Bar No. 24125824
garrett@millerfairhenry.com
MILLER FAIR HENRY PLLC
1507 Bill Owens Parkway
Longview, TX 75604
(903) 757-6400 (telephone)
(903) 757-2323 (facsimile)

*Counsel for Plaintiff*
*Onesta IP, LLC*